15-2164-cv
Global Reinsurance Corp. of America v. Century Indemnity Co.

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2015

(Argued: May 5, 2016                           Decided: December 8, 2016)

Docket No. 15-2164-cv

_____

GLOBAL REINSURANCE CORPORATION
OF AMERICA, successor in interest to
CONSTITUTION REINSURANCE
CORPORATION,

*Plaintiff-Counter-Defendant-Appellee*,

v.

CENTURY INDEMNITY COMPANY,
successor in interest to CCI INSURANCE
COMPANY, successor in interest to
INSURANCE COMPANY OF NORTH
AMERICA,

*Defendant-Counter-Claimant-Appellant*.[1]

_____

[1] The Clerk of Court is respectfully directed to amend the caption as above.

Before: POOLER, LIVINGSTON, and CARNEY, *Circuit Judges*.

Appeal from a June 3, 2015 judgment of the United States District Court for the Southern District of New York (Lorna G. Schofield, *J.*), granting summary judgment in favor of Global Reinsurance Corporation of America ("Global") and declaring that the dollar amount stated in the "Reinsurance Accepted" section of certain reinsurance certificates unambiguously caps the maximum amount that Global can be obligated to pay Century Indemnity Company ("Century") for both "losses" and "expenses" combined. Century contends that Global is obligated to pay expenses in addition to the amount stated in the "Reinsurance Accepted" provision and that, at a minimum, the district court erred in concluding that the certificates were unambiguous. Because this case presents an important question of New York law that the New York Court of Appeals has never directly addressed, we certify to the New York Court of Appeals the following question:

> Does the decision of the New York Court of Appeals in *Excess Insurance Co. v. Factory Mutual Insurance Co.*, 3 N.Y.3d 577 (2004), impose either a rule of construction, or a strong presumption, that a per occurrence liability cap in a reinsurance contract limits the total reinsurance available under the contract to the amount of the cap regardless of whether the underlying policy is understood to cover expenses such as, for instance, defense costs?

Question certified.

_____

JONATHAN HACKER, O'Melveny & Myers LLP
(Daryn E. Rush, Ellen K. Burrows, White and Williams
LLP, Philadelphia, PA, *on the brief*), Washington, D.C.,
*for Defendant-Counter-Claimant-Appellant*.

DAVID L. PITCHFORD, Pitchford Law Group LLC,
New York, NY, *for Plaintiff-Counter-Defendant-Appellee*.

STEVEN C. SCHWARTZ, Chaffetz Lindsey LLP (Peter
R. Chaffetz, Gretta L. Walters, *on the brief*), New York,
NY, *for Aon Benfield U.S.; Guy Carpenter & Company,
LLC; JLT Re (North America Inc.); and Willis Re Inc., as
amicus curiae supporting Defendant-Counter-Claimant-
Appellant*.

POOLER, *Circuit Judge*:

This appeal arises out of a dispute between Century Indemnity Company ("Century") and Global Reinsurance Corporation of America ("Global") over the extent to which Global is obligated to reinsure Century pursuant to certain reinsurance certificates. The United States District Court for the Southern District of New York (Lorna G. Schofield, *J.*) held that the dollar amount stated in the "Reinsurance Accepted" section of the certificates unambiguously caps the amount that Global can be obligated to pay Century for both "losses" and

3

"expenses" combined. Century contends that Global is obligated to pay expenses in addition to the amount stated in the "Reinsurance Accepted" provision and that, at a minimum, the district court erred in concluding that the certificates were unambiguous. Because this case presents an important question of New York law that the New York Court of Appeals has never directly addressed, we certify to the New York Court of Appeals the following question:

> Does the decision of the New York Court of Appeals in *Excess Insurance Co. v. Factory Mutual Insurance Co.*, 3 N.Y.3d 577 (2004), impose either a rule of construction, or a strong presumption, that a per occurrence liability cap in a reinsurance contract limits the total reinsurance available under the contract to the amount of the cap regardless of whether the underlying policy is understood to cover expenses such as, for instance, defense costs?

## BACKGROUND

Between 1971 and 1980, Century issued nine reinsurance certificates with Global.[2] The certificates provided that Global would reinsure specified portions of general liability insurance policies that Century had issued to Caterpillar Tractor Company. In such an arrangement, Century is known as the "ceding

---

[2] The certificates were entered into by Century's predecessor in interest, the Insurance Company of North America, and Global's predecessor in interest, the Constitution Reinsurance Corporation. For simplicity, we use the names of the current parties in interest: Century and Global.

insurer" because it is "ceding" or spreading its risk of loss among one or more reinsurers.

Beginning in 1988, thousands of lawsuits were filed against Caterpillar alleging bodily injury resulting from exposure to asbestos. A coverage dispute then arose between Century and Caterpillar, and both companies filed suit in Illinois seeking declaratory judgments concerning their obligations under the insurance policies. As a result of the Illinois litigation, Century became obligated to reimburse Caterpillar for defense expenses in addition to the indemnity limits of the policies. Global alleges that Century has already paid more than $60 million to Caterpillar and has agreed to pay an additional $30.5 million. Global further alleges that only about 10% of this amount represents what Century refers to as "loss," whereas about 90% represents what Century refers to as "expenses."

Century then sought reimbursement from Global for portions of its payments to Caterpillar pursuant to the reinsurance certificates. One of those certificates, which the parties call "Certificate X," provides in relevant part as follows:

[Global] [d]oes hereby reinsure [Century] in respect of [Century's liability insurance policy with Caterpillar] and in consideration of the payment of the premium and subject to the terms, conditions, and amount of liability set forth herein, as follows: . . .

Item 1 – <u>Type of Insurance</u>
      Blanket General Liability, excluding Automobile Liability as original.

Item 2 – <u>Policy Limits and Application</u>
      $1,000,000. each occurrence as original.

Item 3 – <u>[Century] Retention</u>
      The first $500,000. of liability as shown in Item #2 above.

Item 4 – <u>Reinsurance Accepted</u>
      $250,000. part of $500,000. each occurrence as original excess of [Century's] retention as shown in Item #3 above.

Item 5 – <u>Basis</u>
      Excess of Loss.

App'x at 88.[3] The certificate goes on to state that "the liability of [Global] specified in Item 4 above shall follow that of [Century] and, except as otherwise specifically provided herein, shall be subject in all respects to all the terms and conditions of [the underlying liability insurance policy]." App'x at 89. The certificate also provides that "[a]ll claims involving this reinsurance, when

---

[3] Century suggests that later agreements modified the total dollar amounts covered by the reinsurance certificate. Such modifications do not affect the issues in this appeal.

settled by [Century], shall be binding on [Global], who shall be bound to pay its proportion of such settlements, and in addition thereto, in the ratio that [Global's] loss payment bears to [Century's] gross loss payments, [Global's] proportion of expenses . . . incurred by [Century] in the investigation and settlement of claims or suits." App'x at 89. Though not all of the certificates are in the record before us, the parties suggest that other eight certificates are materially similar.

In Global's view, the amount stated in the "Reinsurance Accepted" section caps the maximum amount that it can be obligated to pay for both loss and expenses combined. Thus, Global contends that the maximum amount that it can be required to pay under Certificate X is $250,000. Century contends that the amount stated in the "Reinsurance Accepted" provision applies only to "loss" and that Global must pay all expenses that exceed that amount.

In the district court, Global moved for partial summary judgment seeking a declaration that its interpretation of the certificates was correct. The district court granted Global's motion and held that the certificates unambiguously capped Global's liability for both losses and expenses. *See Glob. Reins. Corp. of Am. v. Century Indem. Co.*, No. 13 Civ. 06577, 2014 WL 4054260, at *4-7 (S.D.N.Y.

7

Aug. 15, 2014), *reconsideration denied*, 2015 WL 1782206 (S.D.N.Y. Apr. 15, 2015). In reaching this conclusion, the district court relied primarily on this Court's decision in *Bellefonte Reinsurance Co. v. Aetna Casualty & Surety Co.*, 903 F.2d 910 (2d Cir. 1990), which considered a similar reinsurance certificate. The *Bellefonte* court affirmed a judgment declaring that the reinsurers "were not obligated to pay . . . any additional sums for defense costs over and above the limits on liability stated in the reinsurance certificates." *Id.* at 910. The district court also relied on this Court's decision in *Unigard Security Insurance Co. v. North River Insurance Co.*, 4 F.3d 1049 (2d Cir. 1993), which applied *Bellefonte* to conclude that a reinsurer was "not liable for expenses beyond the stated liability limit in the [c]ertificate." *Id.* at 1071. Century timely appealed the district court's grant of summary judgment to Global.

## DISCUSSION

We review the district court's grant of summary judgment de novo and will affirm if "viewing the evidence in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact." *Baldwin v.*

8

*EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (internal quotation marks and citation omitted).[4]

In *Bellefonte*, we considered a reinsurance certificate that provided as follows:

Provision 1

Reinsurer does hereby reinsure Aetna (herein called the Company) in respect of the Company's contract hereinafter described, in consideration of the payment of the premium and subject to the terms, conditions and amount of liability set forth herein, as follows[.]

Provision 2

Reinsurance Accepted

$500,000 part of $5,000,000 excess of $10,000,000 excess of underlying limits[.]

Provision 3

The Company warrants to retain for its own account the amount of liability specified above, and the liability of the Reinsurer specified above [i.e., amount of reinsurance accepted] shall follow that of the Company.

Provision 4

---

[4] The district court concluded that the substantive law of New York applies to this diversity action because Global is located in New York and because the certificates were issued in New York. *See Global*, 2014 WL 4054260, at *3-4. Neither party challenges this conclusion on appeal.

All claims involving this reinsurance, when settled by the Company, shall be binding on the Reinsurer, which shall be bound to pay its proportion of such settlements, and in addition thereto, in the ratio that the Reinsurer's loss payment bears to the Company's gross loss payment, its proportion of expenses incurred by the Company in the investigation and settlement of claims or suits[.]

903 F.2d at 911 (brackets in Provision 3 in original). The district court in *Bellefonte* had held that, under this certificate, the reinsurers "were not obligated to pay Aetna any additional sums for defense costs over and above the limits on liability stated in the reinsurance certificates." *Id.* at 910.

Aetna raised two arguments on appeal. First, Aetna argued that the third provision of the certificate contained a "follow the fortunes" clause and that the "'follow the fortunes doctrine' of reinsurance law obligates a reinsurer to indemnify a reinsured for all of the reinsured's defense expenses and costs, even when those expenses and costs bring the total amount to more than the explicit limitation on liability contained in . . . [the] reinsurance certificate." *Id.* at 912.[5]

---

[5] In *Bellefonte*, we described the "follow the fortunes" doctrine as "meaning that the reinsurer will follow the fortunes or be placed in the position of the insurer." 903 F.2d at 912 (internal quotation marks and citation omitted). "[T]he doctrine burdens the reinsurer with those risks which the direct insurer bears under the direct insurer's policy covering the original insured." *Id.* (citation omitted).

Second, Aetna argued that the phrase "in addition thereto" in the fourth provision of the certificate "indicates that liability for defense costs is separate from liability for the underlying losses sustained by [the insured]." *Id.* at 913.

We rejected both of Aetna's arguments. First, we held that "allowing the 'follow the fortunes' clause to override the limitation on liability . . . would strip the limitation clause and other conditions of all meaning." *Id.* The "'follow the fortunes clauses in the certificates," we reasoned, "are structured so that they coexist with, rather than supplant, the liability cap." *Id.* "To construe the certificates otherwise," we held, "would effectively eliminate the limitation on the reinsurers' liability to the stated amounts." *Id.* (citation omitted).

Second, we rejected Aetna's argument that the phrase "in addition thereto" in the fourth provision of the certificate indicated that liability for defense costs was separate from liability for the underlying losses sustained by the insured. We read the phrase "in addition to" "merely to differentiate the obligations for losses and for expenses." *Id.* And, noting that Provision 1 of the contract explicitly made reinsurance under the certificate "subject to the amount of liability set forth therein," we held that the "in addition to" language "in no

way exempts defense costs from the overall monetary limitation in the certificate." *Id.* at 913-14.

These were the only two arguments that were addressed in *Bellefonte*. Significantly, although we described the amount stated in the "Reinsurance Accepted" provision as an "explicit limitation on liability," *id.* at 912, we never explained why this was so.

In *Unigard*, we again confronted the issue of a reinsurer's liability for expenses. *See* 4 F.3d at 1070-71. There, the ceding insurer, North River, raised two arguments as to why the reinsurer, Unigard, was required to pay expenses that exceeded the "limits" of liability of the certificate.[6] *Id.* First, North River noted that the certificate at issue contained a "follow the form" clause that was not considered in *Bellefonte* and argued that this clause required Unigard to pay expenses in excess of the policy limit.[7] *Id.* at 1070. Second, North River argued

---

[6] Again, in *Unigard*, we described the amounts stated in the certificate as "limits" on liability, though we did not explain why this was so. *See* 4 F.3d at 1070.
[7] The "follow the form" clause stated:

> The liability of Unigard shall follow that of North River and, except as otherwise provided by this [c]ertificate, shall be subject in all respects to all the terms and conditions of North River's policy except such as may purport to create a direct obligation of Unigard to the original insured or anyone other than North River.

that "past practices" demonstrated that Unigard "expected to pay expenses." *Id.* at 1071.

As in *Bellefonte*, we again rejected the ceding insurer's arguments. Regarding the argument based on the "follow the form" clause, we noted that the clause stated that the liability of the reinsurers would be subject to the terms and conditions of the underlying policy "except as otherwise provided by th[e] [c]ertificate." *Id.* at 1070 (emphasis omitted). We held that the certificate "otherwise provide[d] for the policy limits" because another provision of the certificate, "like the certificate in *Bellefonte*, provide[d] that Unigard agreed to reinsure North River 'in consideration of the payment of the reinsurance premium and subject to the terms, conditions, *limits of liability*, and [c]ertificate provisions set forth herein.'" *Id.* at 1071 (citation omitted). We noted that *Bellefonte* stated that "the limitation on liability provision capped the reinsurers' liability under the [c]ertificate" and that "[a]ll other contractual language must be construed in light of that cap." *Id.* at 1071 (quoting *Bellefonte*, 903 F.2d at 914). We also rejected as irrelevant Unigard's expectations or past practices, holding that "*Bellefonte*'s gloss upon the written agreement is conclusive." *Id.*

---

*Id.* at 1055.

13

As noted, the district court in this case held that, under *Bellefonte* and *Unigard*, Global's "total liability for both loss and expenses is capped at the dollar amount stated in the 'Reinsurance Accepted' section of each [c]ertificate." *Global*, 2014 WL 4054260, at *5. The court concluded that the relevant language in the certificates at issue in this case was "nearly identical to the language" in *Bellefonte*. *Id.* The court rejected Century's argument that *Bellefonte* was distinguishable on the ground that, here, the insurer on the underlying policies pay expenses above and beyond limits for loss, noting that, in *Unigard*, this court "followed the reasoning of *Bellefonte* when dealing with underlying policies that pay expenses above and beyond the limits for loss." *Id.* (citation omitted).

Century now argues, with the support of four large reinsurance brokers, that *Bellefonte* and *Unigard* were wrongly decided. *See* Appellant's Br. at 13, 20; Brief for Aon Benfield U.S.; Guy Carpenter & Co., LLC; JLT Re (N. Am.) Inc.; and Willis Re Inc. as Amicus Curiae Supporting Appellant at 15-17 (hereinafter "Brief for Reinsurance Brokers") (noting that "*Bellefonte* and its progeny have been roundly criticized in the insurance industry"). Their argument is not without force. In particular, we find it difficult to understand the *Bellefonte* court's conclusion that the reinsurance certificate in that case *unambiguously* capped the

14

reinsurer's liability for both loss and expenses. Looking only to the language of the certificate, we think it is not entirely clear what exactly the "Reinsurance Accepted" provision in *Bellefonte* meant. Evidence of industry custom and practice might have shed light on this question, but the *Bellefonte* court did not consider any such evidence in its decision, although it is unclear if any was presented.

The purpose of reinsurance is to enable the reinsured to "spread its risk of loss among one or more reinsurers." *Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, 96 N.Y.2d 583, 587 (2001). If the amount stated in the "Reinsurance Accepted" provision is an absolute cap on the reinsurer's liability for both loss and expense, then Century's payments of defense costs could be entirely unreinsured. This seems to be in tension with the purpose of reinsurance. Further, Century and amici note that the premium Global received was "commensurate with its share of policy risk." Appellant's Br. at 10; *see also* Brief for Reinsurance Brokers at 8. Thus, under Certificate X, Global "received 50% of the net (risk) premium" because it "reinsured a 50% part of the [underlying policy] risk." Appellant's Br. at 10 (internal quotation marks omitted). Interpreting the "Reinsurance Accepted" provision as a cap for both

15

losses and expenses, as we did in *Bellefonte*, could permit Global to receive 50% of the premium while taking on less than 50% of the risk.

Amici warn that continuing to follow *Bellefonte* could have "disastrous economic consequences" for the insurance industry. Brief for Reinsurance Brokers at 16. They contend that "potentially massive exposures to insurance companies throughout the industry would be unexpectedly unreinsured[,]" thereby, in amici's view, "create a gaping hole in reinsurance for many companies, and potentially threaten some with insolvency." Brief for Reinsurance Brokers at 16.

We find these arguments worthy of reflection. But there are other considerations as well. For example, the principle of stare decisis counsels against overruling a precedent of this Court, especially in cases involving contract rights, where "considerations favoring stare decisis are at their acme." *Kimble v. Marvel Entm't, LLC*, 135 S. Ct. 2401, 2410 (2015) (italics and internal quotation marks omitted). Here, reinsurers may have relied on this Court's opinions in *Bellefonte* and *Unigard* in estimating their exposure and in setting appropriate loss reserves. If the interpretive rule set out in those opinions were to shift, such reinsurers would be exposed to unexpected claims beyond their

16

current reserves. Granted, the ceding insurers who are now being required to cover defense costs they apparently never contemplated at the time the policies were issued may currently be experiencing the same shift in expectations. Nonetheless, the economic impact of a reversal of the *Bellefonte-Unigard* rule may counsel in favor of retaining the status quo.

Ultimately, as we noted in *Unigard*, "[t]he efficiency of the reinsurance industry would not be enhanced by giving different meanings to identical standard provisions depending upon idiosyncratic factors in particular lawsuits." 4 F.3d at 1071. Our intention, therefore, is to seek the New York Court of Appeals as to whether a consistent rule of construction specifically applicable to reinsurance contracts exists; we express no view as to whether such a rule is advisable or what that rule should be. The interpretation of the certificates at issue here is a question of New York law that the New York Court of Appeals has a greater interest and greater expertise in deciding than do we. Accordingly, we conclude that it is prudent to seek the views of the New York Court of Appeals on this important question.

We may certify a question to the New York Court of Appeals where "determinative questions of New York law are involved . . . for which no

controlling precedent of the Court of Appeals exists." *See* N.Y. Comp. Codes R. &

Regs. Tit. 22, § 500.27(a). Global contends that the Court of Appeals' decision in

*Excess Insurance Co. v. Factory Mutual Insurance Co.*, 3 N.Y.3d 577 (2004) controls

this case. We disagree.

In *Excess*, the Court of Appeals considered whether a reinsurer was

obligated to pay expenses that exceeded the limit provided for in the reinsurance

policy.[8] *Id.* at 579. In *Excess*, however, the parties agreed that the reinsurance

policy contained a liability cap. *See id.* at 582 ("[T]here is no dispute that the

reinsurance agreements set the policy limit at $7 million per occurrence.").

Having assumed that a such a cap existed, the Court of Appeals then followed

*Bellefonte* and *Unigard* to hold that subordinate clauses could not expand

reinsurer liability "beyond the stated limit in the policy" because doing so would

"render meaningless the liability cap negotiated in the policy." *Id.* at 583. The

*Excess* court never addressed, much less decided, the antecedent question of

whether the stated limited represented an absolute coverage limit for losses and

expenses combined, which is the question that is presented in this case.

---

[8] The provision at issue in *Excess* was titled "Limit," as opposed to "Reinsurance
Accepted." 3 N.Y.3d at 580.

Moreover, in *Excess*, the Court of Appeals considered whether a reinsurer was required to cover the ceding insurer's loss adjustment expenses—the costs of litigating with the insured—in excess of the policy limit, not whether a reinsurer was required to cover the insured's own defense costs. *Id.* at 583-84. But whether a reinsurer is responsible to reimburse the ceding insurer for the cost of litigating with the insured over the insured's claim is a potentially different question than whether an insurer who has been held liable on the underlying policy for the expenses of defending claims against the insured may then demand that its reinsurers share their proportional cost of the underlying coverage. Thus, *Excess* is not controlling.

Although *Excess* does not directly control this case, the decision of the Court of Appeals to expand on our holding in *Bellefonte* and *Unigard* might fairly be taken to imply a rule of construction governing the interpretation of reinsurance policies. In other words, we are uncertain whether *Excess* imposes a rule (or, potentially, creates a rebuttable presumption) that, where a reinsurance contract is subject to a per occurrence liability cap, the cap limits the total reinsurance available regardless of whether the underlying insurance policy is understood to include expenses other than losses, for instance, defense costs. If

19

*Excess* imposes a clear rule (or a presumption) with respect to these reinsurance policies, the rule would guide our interpretation of this and substantially similar policies. If, on the other hand, the standard rules of contract interpretation apply, we would construe each reinsurance policy solely in light of its language and, to the extent helpful, specific context. Because this is ultimately a determination to be made by New York, we certify[9] the following question to the New York Court of Appeals:

> Does the decision of the New York Court of Appeals in *Excess Insurance Co. v. Factory Mutual Insurance Co.*, 3 N.Y.3d 577 (2004), impose either a rule of construction, or a strong presumption, that a per occurrence liability cap in a reinsurance contract limits the total reinsurance available under the contract to the amount of the cap regardless of whether the underlying policy is understood to cover expenses such as, for instance, defense costs?

## CONCLUSION

For the foregoing reasons and pursuant to New York Court of Appeals Rule 500.27 and Local Rule 27.2 of this Court, we certify the following question to the New York Court of Appeals:

---

[9] The parties did not request certification. However, even where the parties do not request certification, "we are empowered to seek certification nostra sponte." *10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co.*, 634 F.3d 112, 125 (2d Cir. 2010) (italics omitted).

Does the decision of the New York Court of Appeals in *Excess Insurance Co. v. Factory Mutual Insurance Co.*, 3 N.Y.3d 577 (2004), impose either a rule of construction, or a strong presumption, that a per occurrence liability cap in a reinsurance contract limits the total reinsurance available under the contract to the amount of the cap regardless of whether the underlying policy is understood to cover expenses such as, for instance, defense costs?

In certifying this question, we do not bind the Court of Appeals to the particular question stated. The Court of Appeals may modify the question as it sees fit and, should it choose, may direct the parties to address other questions it deems relevant. This panel will resume its consideration of this appeal after the disposition of this certification by the Court of Appeals.

It is hereby **ORDERED** that the Clerk of Court transmit to the Clerk of the New York Court of Appeals this opinion as our certificate, together with a complete set of the briefs, the appendix, and the record filed in this Court by the parties. The parties shall bear equally any fees and costs that may be imposed by the New York Court of Appeals in connection with this certification.