================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------
No. 124
Global Reinsurance Corporation of
America, successor in interest to
Constitution Reinsurance
Corporation,
            Respondent,
        v.
Century Indemnity Company,
successor in interest to CCI
Insurance Company, successor in
interest to Insurance Company of
North America,
            Appellant.


            Jonathan D. Hacker, for appellant.
            David C. Frederick, for respondent.
            Continental Casualty Company, et al.; Aon Benfield
U.S., et al., amici curiae.


FEINMAN, J.:

        The narrow issue before us pertains to the scope of our

prior ruling in Excess Insurance Co. Ltd. v Factory Mutual

Insurance Co. (3 NY3d 577 [2004]).  Pursuant to Rule 500.27 of

this Court, the United States Court of Appeals for the Second

- 1 -

Circuit has certified the following question to us:

> "Does the decision of the New York Court of
> Appeals in [Excess] impose either a rule of
> construction, or a strong presumption, that a
> per occurrence liability cap in a reinsurance
> contract limits the total reinsurance
> available under the contract to the amount of
> the cap regardless of whether the underlying
> policy is understood to cover expenses such
> as, for instance, defense costs?"

(Global Reinsurance Corporation of America v Century Indemnity
Company, 843 F3d 120, 128 [2d Cir 2017]).[1]  We now answer the
certified question in the negative.  Under New York law
generally, and in Excess in particular, there is neither a rule
of construction nor a presumption that a per occurrence liability
limitation in a reinsurance contract caps all obligations of the
reinsurer, such as payments made to reimburse the reinsured's
defense costs.

I.

Reinsurance is the insurance of one insurer by another
(see Matter of Union Indem. Ins. Co. of N.Y., 89 NY2d 94, 105-106
[1996]).  "When entering into a reinsurance contract, an

---

[1] The parties are Global Reinsurance Corporation of America
f/k/a Constitution Reinsurance Corporation (Global), a
reinsurance company, and Century Indemnity Company f/k/a
Insurance Company of North America (Century), an insurance
company that reinsured some of its policies with Global.  The
underlying facts and procedural posture of this dispute are set
forth in the opinion and order of the United States District
Court for the Southern District of New York, filed August 15,
2014 (2014 WL 4054260 [SD NY Aug. 15, 2014]) and the order of the
Second Circuit, filed December 8, 2016, certifying this question
(843 F3d 120).

insurance company agrees to pay a particular premium to a reinsurer in return for reimbursement of a portion of its potential financial exposure under certain direct insurance policies it has issued to its customers" (Travelers Cas. & Sur. Co. v Certain Underwriters at Lloyd's of London, 96 NY2d 583, 587 [2001]).  "Through this indemnity relationship, the reinsured seeks to 'cede' or spread its risk of loss among one or more reinsurers" (id.).  Through this process, reinsurance permits the cedent insurer to "minimize its exposure to catastrophic loss," "reduce the amount of the legally required reserves held for the protection of policyholders," and "increase [its] ability to underwrite other policies or make other investments" (Matter of Midland Ins. Co., 79 NY2d 253, 258 [1992]).

There are two types of reinsurance: treaty and facultative.  Under a reinsurance treaty, the cedent transfers to the reinsurer its risk under an entire line of business spanning multiple insurance policies (see Travelers, 96 NY2d at 587-588; Sumitomo Marine & Fire Ins. Co., Ltd.-U.S. Branch v Cologne Reinsurance Co. of America, 75 NY2d 295, 301 [1990]).  By contrast, in facultative reinsurance, the reinsurer agrees to indemnify the cedent for all or a portion of the cedent's risk under a single policy in the event of loss (see 1A Couch on Ins. § 9:3 [3d ed. 2016]; Travelers, 96 NY2d at 587).  In other words, "[f]acultative reinsurance is policy-specific" (Travelers, 96 NY2d at 587).  For purposes of this certified question, we are

concerned only with facultative reinsurance.[2]

The coverage provided under a facultative reinsurance contract is "memorialized in a certificate" (Barry R. Ostrager & May Kay Vyskocil, Modern Reinsurance Law and Practice § 1:03 [3d ed. 2014]; accord William Hoffman, Facultative Reinsurance Contract Formation, Documentation and Integration, 38 Tort Trial & Ins Prac L J 763, 809 [Spring 2003] ["By a certificate, the reinsurer attests that the facultative reinsurance placement is complete and the contract in effect"]).  These certificates are usually "standard forms" (North River Ins. Co. v CIGNA Reinsurance Co., 52 F3d 1194, 1199 [3d Cir 1995]), "short and concise, using terms of art rather than lengthy, legalistic explications to define the obligations of the parties" (Ostrager & Vyskocil, § 2:02; see Sumitomo, 75 NY2d at 302).

Typically, the facultative reinsurer is obligated to indemnify the cedent up to a stated upper limit (see Travelers, 96 NY2d at 588).  For example, one of the certificates relevant to the underlying dispute, which the parties refer to as "Certificate X," reads:

_____

[2] The question did not explicitly limit itself to "facultative" reinsurance.  However, because the question is premised on what "the underlying policy . . . cover[s]" (Global Reinsurance, 843 F3d at 128), we understand it to be a question solely about facultative reinsurance, rather than one about reinsurance treaties, which do not have a single "underlying policy."

"Item 1 - <u>Type of Insurance</u>

Blanket General Liability, excluding
Automobile Liability as original.

Item 2 - <u>Policy Limits and Application</u>

$1,000,000. each occurrence as original.

Item 3 - <u>[Cedent] Company Retention</u>
The first $500,000. of liability as shown in
Item #2 above.

Item 4 - <u>Reinsurance Accepted</u>

$250,000. part of $500,000. each occurrence
as original excess of the [cedent] Company's
retention as shown in Item #3 above.

Item 5 - <u>Basis</u>

Excess of Loss"

(<u>Global Reinsurance</u>, 843 F3d at 123). Certificate X reinsures an underlying insurance policy of $1 million per occurrence, with the cedent retaining the first $500,000 of such liability, and the reinsurer assuming up to $250,000 in excess thereof.

An underlying third-party liability insurance policy will often require the insurer to either pay the insured's costs in defending covered claims, or to provide legal counsel and defend the claim itself (see <u>e.g.</u> <u>Seaboard Sur. Co. v Gillette Co.</u>, 64 NY2d 304, 309-310 [1984]). These expenses are distinct from indemnity payments for actual losses (see <u>id.</u> at 310 ["Though policy coverage is often denominated as 'liability insurance,' where the insurer has made promises to defend 'it is clear that (the coverage) is, in fact, 'litigation insurance' as well"], quoting <u>International Paper Co. v Continental Cas. Co.</u>,

35 NY2d 322, 326 [1974]).

One recurring issue in reinsurance disputes is whether these defense costs, insofar as they are reinsured by a facultative reinsurance policy, count towards the limit in the reinsurance accepted clause ($250,000 in the example above). Here, Global averred that, as of the filing of its motion for summary judgment, Century billed it $327,149 under Certificate X, consisting of $82,627 in loss and $244,522 in expense. Global argued that, under the reinsurance accepted clause, its obligation to Century for both loss and expense payments under Certificate X is capped at $250,000 (see Global Reinsurance, 843 F3d at 123). Century argued that this $250,000 limit applied only to losses and that Global must also pay all expenses, even if losses and expenses combined would exceed $250,000 (id.).

This brings us to the question certified by the Second Circuit: whether our 2004 decision in Excess (3 NY3d 577) imposed "either a rule of construction, or a strong presumption, that a per occurrence liability cap in a reinsurance contract limits the total reinsurance available under the contract, to the amount of the cap regardless of whether the underlying policy is understood to cover expenses such as, for instance, defense costs" (Global Reinsurance, 843 F3d at 128). As the Second Circuit noted:

> "If Excess imposes a clear rule (or a presumption) with respect to these reinsurance policies, the rule would guide our interpretation of this and substantially similar policies. If, on the other hand, the standard rules of contract interpretation

apply, we would construe each reinsurance
policy solely in light of its language and,
to the extent helpful, specific context"

(id.).  We now turn to that decision.

## II.

Our opinion in Excess addressed whether a reinsurer's obligation to pay loss adjustment expenses[3] arising from a "follow-the-settlements" clause was subject to the stated indemnification limit in the reinsurance policy.  Factory Mutual Insurance Company (Factory) issued a property insurance policy to Bull Data Systems Inc. (Bull Data), covering the risk of loss or damage to Bull Data's personal computer inventory (see Excess, 3 NY3d at 579).  Factory, in turn, reinsured the Bull Data policy with various reinsurers, including the respondents in that case (see id. at 579-80).  The respondents issued a facultative reinsurance certificates to Factory that read, in relevant part:

> "INTEREST: Goods and/or merchandise
> incidental to the Assured's business
> consisting principally of personal computers
> and/or as original.
>
> "LIMIT: US$ 7,000,000 any one occurrence p/o
> US$ 13,500,000 any one occurrence excess of
> US$ 25,000,000 any one occurrence
>
> "CONDITIONS: As original and subject to the
> same valuation, clauses and conditions as
> contained in the original policy or policies
> but only to cover risks of All Risks of

_____

[3] Loss adjustment expenses are "the expense incurred by the insurer to investigate and settle a claim" (CSX Corporation v North River Insurance Company, 2009 WL 10671267, at *8 [MD Fla Sept. 25, 2009]).

> Physical Loss or Damage but excluding
> Inventory Shortage.  Including Strikes,
> Riots, Civil Commotions and Malicious Damage
> risks if and as original.  Premium payable as
> original.  Reinsurers agree to follow the
> settlements of the Reassured in all respects
> and to bear their proportion of any expenses
> incurred, whether legal or otherwise, in the
> investigation and defence of any claim
> hereunder.  Service of Suit Clause (U.S.A.).
> Insolvency Clause"

(id. at 580).  A fire destroyed the warehouse where Bull Data's inventory was stored and, suspecting arson, Factory disputed coverage (see id. at 580-81).  Though Factory ultimately settled the claim, it incurred approximately $35 million in loss adjustment expenses in the litigation against Bull Data (see id.).  Factory then sought $12 million from the respondents, representing $7 million for the Bull Data settlement and an additional $5 million representing the reinsurers' proportional share of loss adjustment expenses (see id.).  Factory argued that the reinsurers' undertaking to bear their proportion of expenses pursuant to the follow-the-settlements clause was "separate and apart from the indemnification cap on the policy," while the reinsurers countered that their aggregate liability, expenses and all, was capped at $7 million (id. at 582-83).

We held that the reinsurers were entitled to summary judgment on the issue.  "Once the reinsurers have paid the maximum amount stated in the policy, they have no further obligation to pay Factory Mutual any costs related to loss adjustment expenses" (id. at 583).  Having interpreted the

"LIMIT" clause to impose an expense-inclusive $7 million cap, we then rejected Factory's contention that the reinsurers' obligation to indemnify it for loss adjustment expenses could supersede that clause (see id.).

Although Excess did not say that third-party defense costs under any facultative reinsurance contract are unambiguously or presumptively capped by the liability limits in the certificate, some courts have nonetheless read our decision that way (see Utica Mut. Ins. Co. v Munich Reinsurance America, Inc., 594 Fed Appx 700, 704 [2d Cir 2014] [summary order] ["(T)he Court of Appeals arguably . . . suggested that a limit of liability, standing alone, is presumptively expense-inclusive because it serves to cap a reinsurer's total exposure (for losses and expenses) at a specific, negotiated amount"] [emphasis omitted]; Century Indemnity Company v OneBeacon Insurance Company, -- A3d --, 2017 PA Super 328, 2017 WL 4639578, at *9 [Pa Super Oct. 17, 2017] [describing "the presumption created by the Excess Court that defense costs are capped by the liability limits unless they are explicitly excluded elsewhere in the certificate"]; Utica Mut. Ins. Co. v Clearwater Ins. Co., 2014 WL 6610915, at *3 [ND NY Nov. 20, 2014] [stating that, under Excess, "a facultative reinsurance certificate's stated limit provides an overall cap on the reinsurer's liability unless it expressly states that expenses are excluded from the certificate's limit"], reconsideration denied 2015 WL 4496374 [ND NY Jul. 23, 2015]).

We now dispel any intimation that Excess established such a rule.

"It is basic that principles of law 'are not established by what was said, but by what was decided, and what was said is not evidence of what was decided, unless it relates directly to the question presented for decision'" (Knight-Ridder Broadcasting, Inc. v Greenberg, 70 NY2d 151, 160 n 6 [1987], quoting People ex rel. Metropolitan St. Ry. Co. v State Bd. of Tax Commrs., 174 NY 417, 447 [1903]; accord Art Masters Associates, Ltd. v United Parcel Service, 77 NY2d 200, 208 n 6 [1990]).  Accordingly, the Court's holding comprises only those "statements of law which address issues which were presented to the [Court] for determination" (Village of Kiryas Joel v County of Orange, 144 AD3d 895, 900 [2d Dept 2016]).

The Excess Court was simply not faced with the question presently before the Second Circuit: whether there is a blanket "presumption" or "rule of construction" that a limitation-on-liability clause applies to all payments by a reinsurer whatsoever.  The only issue before the Court was whether that certificate's phrase "LIMIT: US$ 7,000,000," in context, established that the reinsurers' aggregate liability for both settlement costs and loss adjustment expenses was capped at $7 million.  Each party seized on unique turns of phrase in the certificate to argue that they were entitled to judgment as a matter of law.  Critically, we did not read the limit clause in isolation, but in light of the entire agreement as an integrated

whole, "giv[ing] meaning to every sentence, clause and word" thereof (Travelers, 96 NY2d at 594, citing Northville Indus. Corp. v National Union Fire Ins. Co., 89 NY2d 621, 632-633 [1997]).  This is precisely what we have done in other reinsurance cases, both before Excess and since (see United States Fid. & Guar. Co. v American Re-Ins. Co., 20 NY3d 407, 419-420 [2013]; Union Carbide Corp. v Affiliated FM Ins. Co., 16 NY3d 419, 424-425 [2011]; Travelers, 96 NY2d at 594).

In addition, the loss adjustment expenses were incurred in litigation between the insurer and its policyholder; they were not costs (such as third-party defense costs) that the insurer was obligated to pay under the terms of the underlying policy itself.  Whether a similar (or even identical) limitation clause would apply to third-party defense costs, in a certificate reinsuring a liability insurance policy, was never at issue. Consequently, the Excess Court did not pass on whether a follow-form clause such as the one in that case, "subject[ing]" the reinsurance "to the same valuation, clauses and conditions as contained in the original policy," would require the reinsurers to cover third-party defense costs in excess of such a limit.

### III.

We hold definitively that Excess did not supersede the "standard rules of contract interpretation" (Global Reinsurance, 843 F3d at 128) otherwise applicable to facultative reinsurance contracts.  "Stare decisis does not spring full-grown from a

'precedent' but from precedents which reflect principle and doctrine rationally evolved" (People v Hobson, 39 NY2d 479, 488 [1976]). We therefore read Excess in harmony with the traditional rules of contract interpretation reiterated numerous times by this Court.

Reinsurance contracts are governed by the same principles that govern contracts generally (see Unigard Sec. Ins. Co., Inc. v North River Ins. Co., 79 NY2d 576, 584 [1992] [in reinsurance dispute, "there is no sound reason to depart" from "general contract law principle(s)"]; British Intern. Ins. Co. Ltd. v Seguros La Republica, S.A., 342 F3d 78, 82 [2d Cir 2003]; Christiania General Ins. Corp. of New York v Great American Ins. Co., 979 F2d 268, 274 [2d Cir 1992]). "Reinsurance, like any other contract, depends upon the intention of the parties, to be gathered from the words used, taking into account, when the meaning is doubtful, the surrounding circumstances" (London Assur. Corp. v Thompson, 170 NY 94, 99 [1902]). The agreement should be "read as a whole, and every part will be interpreted with reference to the whole" (Beal Sav. Bank v Sommer, 8 NY3d 318, 324-335 [2007], quoting Matter of Westmoreland Coal Co. v Entech, Inc., 100 NY2d 352, 358 [2003]). Particularly where an agreement is "negotiated between sophisticated, counseled business people negotiating at arms length, . . . courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to

specifically include" (Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004] [citations and internal quotations omitted]).  Courts should be mindful that the certificate, while serving as written confirmation of a contract, might not in and of itself constitute the fully integrated agreement (see Sumitomo, 75 NY2d at 302 ["(I)ssuance . . . of a formal certificate of reinsurance" is "technically unnecessary for a binding agreement"]; Union Carbide Corp., 16 NY3d at 425 [where reinsurance policy incorporates underlying policy, the underlying policy is not considered extrinsic evidence]).

Like any contract, a facultative reinsurance contract "that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (Marin v Constitution Realty, LLC, 28 NY3d 666, 673 [2017], quoting Greenfield v Philles Records, 98 NY2d 562, 569 [2002]). Ambiguity is ascertained by reading the terms of the agreement, not in isolation, but "as a whole" (Ellington v EMI Music, Inc., 24 NY3d 239, 244 [2014]).  If a contract "is reasonably susceptible of only one meaning, a court is not free to alter the contract to reflect its own personal notions of fairness and equity" (Selective Ins. Co. of America v County of Rensselaer, 26 NY3d 649, 655 [2016], quoting Greenfield, 98 NY2d at 569-570). Rather than "adopting a blanket rule, based on policy concerns," the court must "look to the language of the policy" above all else (In re Viking Pump, Inc., 27 NY3d 244, 257 [2016]). Our

cases in the insurance context confirm that even modest variations on the face of a written agreement can alter the meaning of a critical term (see e.g. id. at 258-259 [distinguishing Consolidated Edison Co. of N.Y. v Allstate Ins. Co., 98 NY2d 208 (2002)]; Selective Ins. Co., 26 NY3d at 656 and n * [2016] [distinguishing Appalachian Ins. Co. v General Elec. Co., 8 NY3d 162, 173 (2007)]).

The foregoing principles do not permit a court to disregard the precise terminology that the parties used and simply assume, based on its own familiar notions of economic efficiency, that any clause bearing the generic marker of a "limitation on liability" or "reinsurance accepted" clause was intended to be cost-inclusive. Therefore, New York law does not impose either a rule, or a presumption, that a limitation on liability clause necessarily caps all obligations owed by a reinsurer, such as defense costs, without regard for the specific language employed therein.

IV.

"[I]t is important to emphasize that we are called upon to decide a narrow issue" (Ehrenfield v Bin Mahfouz, 9 NY3d 501, 507 [2007]), namely, whether Excess imposes "either a rule of construction, or a strong presumption, that a per occurrence liability cap in a reinsurance contract limits the total reinsurance available under the contract," including defense

costs (<u>Global Reinsurance</u>, 843 F3d at 128).  For the foregoing reasons, we hold that it does not.

        Accordingly, the certified question should be answered in the negative.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and the record submitted, certified question answered in the negative.  Opinion by Judge Feinman.  Chief Judge DiFiore and Judges Rivera, Stein, Fahey, Garcia and Wilson concur.

Decided December 14, 2017