## HANSEL et al. v. PURNELL et al. *

(Circuit Court of Appeals, Sixth Circuit. July 16, 1924.)

No. 4010.

1. **Equity** ⚖️42(1)—Filing cross-bill for equitable relief estops to deny equity jurisdiction.

Defendants, who by a cross-bill invoke the equity jurisdiction of the court in relation to the same transactions to which the complainant's bill relates and pray for equitable relief, are estopped to deny equity jurisdiction.

2. **Equity** ⚖️11—Suit based on fraud is within equity jurisdiction.

A suit based on alleged fraud and fraudulent representations by defendants, who stood in fiduciary relation to complainants, is within the equity jurisdiction.

*Certiorari denied 45 S. Ct. 98, 69 L. Ed. —.

**3. Equity ⬤⟶21—Has jurisdiction of suit relating to trust property.**

A voluntary religious association, organized under the laws of Michigan, holds property transferred to it in trust, and a suit to protect such trust property and prevent its diversion to other than the trust uses is within the province of a court of equity.

**4. Religious societies ⬤⟶7—Has jurisdiction of suit to cancel contract of membership in association.**

Complainants, who were induced by fraud to become members of a voluntary religious association, which may involve liability for debts of the association, may invoke the jurisdiction of a court of equity for cancellation of their contract of membership.

**5. Equity ⬤⟶39(1)—Jurisdiction, properly invoked, retained to grant full relief.**

Where the jurisdiction of a court of equity is properly invoked, it will, to avoid a multiplicity of suits, proceed to grant full relief.

**6. Associations ⬤⟶20(2)—Voluntary association may sue and be sued in federal court.**

A voluntary association is a distinct entity, which may sue and be sued in a federal court, and where it has appeared and answered as a defendant it is subject to whatever decree may be entered in the suit.

**7. Equity ⬤⟶144—Claim for relief for wrongful expulsion from association not inconsistent with allegations as to fraud inducing membership.**

Allegations in a bill that complainants were induced by fraud and fraudulent representations to become members of a voluntary association are not inconsistent with a claim for relief for being wrongfully expelled therefrom, especially where membership entitled them to material benefits.

**8. Religious societies ⬤⟶14—If lawful, not subject to regulation by courts.**

If the doctrines of a voluntary religious association violate no law or rule of public policy, the courts have no power to interfere with the practices or teachings of that faith, or to afford relief to a member who voluntarily withdraws, or has been rightfully expelled for causes named and in the manner provided by the by-laws or rules and regulations of the society.

**9. Religious societies ⬤⟶7—Members induced to join by fraud held entitled to relief in equity.**

Where the founder and head of a voluntary religious association, who is in absolute control of all its affairs, did not in fact organize it in good faith for religious purposes, but for personal gain and fraudulent and criminal purposes, complainants were induced by fraudulent representations to believe the doctrines taught and to become members, and convey their property and contribute their services to the association, they are entitled to cancellation of their contract of membership, restitution of their property, and recovery from the association for their services, though other officers and members may have acted in good faith.

**10. Evidence ⬤⟶76—Failure of party to testify may be considered in weighing evidence.**

In a suit in equity, failure of defendants, who are charged with fraud, and even with serious crimes, to take the stand to deny the charges, or to testify respecting facts peculiarly within their knowledge, is a circumstance which may not be overlooked.

**11. Religious societies ⬤⟶31(5)—In suit based on theory that association was a fraud, founders' membership in another association pertinent.**

In a suit against a religious association and its founders to cancel contracts of membership and transfers of property and recover for services, on theory that association was organized for fraudulent and immoral purposes, and that plaintiffs were induced to become members by fraud, evidence that founders were members of earlier similar association *held* pertinent.

Appeal from the District Court of the United States for the Southern Division of the Western District of Michigan; John E. Sater, Judge.

Suit in equity by John W. Hansel and wife against Benjamin Franklin Purnell, Mary Purnell, his wife, and the Israelite House of David, a voluntary association. Decree for complainants, and defendants appeal. Affirmed.

W. J. Barnard, of Paw Paw, Mich., for appellants.

Walter M. Nelson, of Detroit, Mich. (Dilley, Souter & Dilley, of Grand Rapids, Mich., on the brief), for appellees.

Before DENISON and DONAHUE, Circuit Judges, and TUTTLE, District Judge.

DONAHUE, Circuit Judge. In 1902–03, Benjamin Franklin Purnell, commonly known and generally referred to as "Benjamin," caused to be copyrighted, printed, and published certain of his writings, consisting of four volumes, called "The Star of Bethlehem," "Seven Books of Wisdom," addressed on the cover page "To the Twelve Tribes of Israel Scattered Abroad," and a great number of pamphlets, among which were "The Little Book," "The Key of the House of David," "The True Light," "What is the Soul?" "Where Did Cain Get His Wife?" These publications proclaimed Benjamin as the "Seventh Angel Messenger, the second child of the son of man who comes with the Seventh Key to unlock the mysteries of godliness—God manifest in the flesh, through whom are revealed the sealed scriptures and Israel, the elect, are to be gathered together and their bodies prepared to receive the Kingdom of God."

The "ingathering," which proposed to include Israel's 144,000, began in 1903, on a tract of land near Benton Harbor, Mich., secured for that purpose by Benjamin and his wife, Mary. In 1903 the Israelite House of David was organized as an ecclesiastical corporation under the laws of the state of Michigan. In 1907, upon objection by the state of Michigan that the corporation was

more of a business enterprise than a religious organization, this corporation was dissolved and the Israelite House of David was organized as a voluntary religious association. At the time of the trial of this cause there were approximately 800 members and the association had accumulated a large amount of property, the title to which is in Benjamin and Mary.

The faith of the Israelite House of David is based upon the publications above mentioned, all of which purport to be Benjamin's interpretation of the Christian Bible. A number of pamphlets were published from time to time, and there is also published a monthly paper, called "Shiloh's Messenger of Wisdom." All of these publications contain further explanations of the faith and rules governing the conduct of members in matters both temporal and spiritual. All persons becoming members of this association. are required to sign its articles of faith and membership agreement, to deliver and transfer to Benjamin and Mary the title to all of their property and effects and to perform labor for the benefit of the community without compensation.

About 1909, John and Margaret Hansel obtained from interested persons some of this literature of the House of David and afterwards entered into correspondence with its home office. They continued to read this literature for several years, and in April of 1912 they went to the House of David with five of their children, one of their sons being already there. Three of these children were of the age of eight and under. After they were in the House of David for about three weeks, they accepted the faith, signed the membership agreement, and transferred to Benjamin and Mary title to all of their property and effects, amounting in the aggregate to about $5,610.27. One lot in Oklahoma so transferred by the Hansels was estimated to be of the value of $792.81, but the title thereto had previously been forfeited for nonpayment of taxes. After they became members, John and Margaret Hansel and their minor children were required to perform, and did perform, services for the benefit of the community for which they received no compensation other than food, shelter, and clothing. Their children were also educated in the schools maintained by the House of David. The Hansels continued as members of this community until December 28, 1920.

In October, 1921, John and Margaret Hansel filed in the District Court their bill of complaint, and later an amended bill, in which they averred that they had been induced to become members of this association through fraud and fraudulent representations, and that they were wrongfully expelled therefrom, and asked that all instruments in writing executed by them be canceled, set aside, and held for naught, and that they recover the value of the property transferred by them to Benjamin and Mary, and the value of their services and the services of their minor children during the time they were members of this colony.

The defendants, Benjamin Franklin Purnell, Mary Purnell, his wife, the Israelite House of David, and all of the members of the association represented by them filed an answer and cross-bill, and an amendment thereto, denying all allegations of fraud and fraudulent representations and that plaintiffs were wrongfully expelled from the society. The defendants further aver that at the time the Hansels left this community and for and in consideration of $100, transportation for their entire family to Nashville, Tenn., and the return of John Hansel's carpenter tools, the plaintiffs executed in writing a release of all of their rights and interests in and to the community property or compensation for labor performed by them, or either of them, or their minor children, and that plaintiffs, by their conduct and contracts, are estopped from claiming any rights or interest in said property. It is further averred that shortly before the plaintiffs left the House of David they entered into a conspiracy against these defendants, and that this action was brought by plaintiffs in furtherance of that conspiracy. The defendants pray for a decree upon their cross-bill, quieting their title to the property and for an order and decree enjoining plaintiffs from committing any depredations, from molesting defendants in the peaceable possession thereof, and from further circulating defamatory statements and falsehoods of and concerning them. The defendants also filed a motion to dismiss for want of federal jurisdiction and for want of equity, which motion was overruled by the trial court and exceptions noted.

The plaintiffs, by reply, deny all averments of misconduct on their part, and further aver that the paper purporting to be a release was not signed by Margaret Hansel, and that John Hansel was compelled to sign the same by threats of personal violence and malicious prosecution.

On the trial of this case the District Court

found upon the issues so joined for the plaintiffs and entered a decree canceling all of the instruments in writing executed by the Hansels to or with the House of David, and upon accounting assessed the amount due to the plaintiffs from the defendants in the sum of $24,078.08, from which decree the defendants have appealed.

The bill of complaint and the amendment thereto aver diversity of citizenship and that the suit involves claims and property rights in excess of $3,000, exclusive of interest and costs. For this reason the motion to dismiss for want of federal jurisdiction was properly overruled.

[1] Even if it appeared, as claimed by defendants, that the plaintiffs have an adequate remedy at law, the cause should not be dismissed for that reason, but, on the contrary, transferred to the law side of the court. In this case, however, the defendants, in their cross-bill, invoke the equity jurisdiction of the court in relation to the same transactions to which the plaintiffs' bill of complaint is directed, and pray for equitable relief. The defendants, having invoked the equity jurisdiction of the court, cannot now be heard to deny its jurisdiction.

[2] Nor does it appear that the plaintiffs have a full and adequate remedy at law. The plaintiffs' action is based upon fraud and fraudulent representation. These subjects are peculiarly within the jurisdiction of equity. Not only that, but it further appears from the pleadings and the evidence that a confidential and fiduciary relation existed between the Hansels on the one part, and Benjamin and the House of David on the other, which required each to make full disclosure, and in such case equity will intervene for the protection of one who has been wronged by failure of the other to make such disclosure. Wright v. Hake, 38 Mich. 525; Wyckoff v. Sewing Machine Co., 43 Mich. 309, 5 N. W. 405.

[3] It also appears from the pleadings and the evidence that the Israelite House of David claims to be a voluntary religious association. If this claim be true, it holds this property in trust. It is the peculiar province of a court of equity to protect such trust funds and prevent their diversion from uses other than the purposes of the trust, either by the trustee or some other person seeking to divert it to his own use. Hundley v. Collins, 131 Ala. 234, 32 South. 575, 90 Am. St. Rep. 33.

[4, 5] Aside from these considerations, the plaintiffs had the right to invoke the aid of a court of equity to cancel and set aside the written contract of membership, which they aver they were induced and procured to sign through fraud and misrepresentation, not only for the purposes of this case, but also as a protection to plaintiffs from creditors of the voluntary association. Where the jurisdiction of a court of equity is properly invoked, it will, to avoid a multiplicity of suits, proceed to an accounting and final adjudication.

[6] The Israelite House of David is a voluntary association. As such it is a distinct entity, and may sue or be sued in the federal court. United Mine Workers et al. v. Coronada Coal Co. et al., 259 U. S. 344, 42 Sup. Ct. 570, 66 L. Ed. 975, 27 A. L. R. 762. The Israelite House of David, as such separate entity, joined in the answer and cross-bill with the other defendants, and this pleading was verified by Francis Thorpe, trustee. For this reason the Israelite House of David was properly in court and subject to its jurisdiction in this action.

The bill of complaint avers, not only that plaintiffs were induced by fraud and fraudulent representation to become members of this society and to sign the membership agreement, but also that they were wrongfully and unlawfully expelled from this society. In such case, a court of equity will grant relief, if it appear that an action at law or in mandamus to restore plaintiffs to membership would not afford an adequate remedy. For the reasons stated, the trial court did not err in overruling defendants' motion to dismiss for want of equity.

[7] It is contended, however, that the plaintiffs' claim that they were induced by fraud and fraudulent representations to become members of the House of David is wholly inconsistent with their claim that they were wrongfully expelled therefrom. This, however, does not necessarily follow. On the contrary, one may be fraudulently induced to join a society, and may also be wrongfully expelled therefrom, but if the proofs sustain the allegations of fraud, and the membership agreement is for that reason set aside and held for naught, then their expulsion therefrom would be of no importance. If, on the other hand, the court should find that the plaintiffs were not fraudulently induced to become members of this society, then they would be entitled to all the benefits of such membership, and if wrongfully expelled they would be entitled to relief. Especially is this true where, as in this case, the membership agreement includes, not only the right to

participate in the spiritual affairs of the colony, but also expressly provides that the House of David "will make and provide a home and maintenance and clothing in common with other members of said society, as circumstances permit, and as from time to time may be determined by the proper officers of this society, so long as said parties of the first part may elect to remain a member thereof and are not expelled from this society." This contract to provide these plaintiffs with a home, maintenance, and clothing was, and is, a valuable property right, of which they cannot be deprived, except for the causes and' in the manner provided by the by-laws.

[8] If the religious doctrines promulgated by Benjamin and accepted by the members of the Israelite House of David violate no law or rule of public policy, the courts have no power to interfere with the practices or the teachings of that faith, or afford any relief to one who voluntarily withdraws or has been rightfully expelled for the causes named and in the manner provided by the by-laws or rules and regulations of the society. Those who remain firm in the faith and constant in their membership are entitled to have the property of the society administered in accordance with its rules and regulations and for its purposes. Watson v. Jones, 13 Wall. (80 U. S.) 679, 20 L. Ed. 666; Borgman v. Bultema, 213 Mich. 684, 182 N. W. 91; Fuchs v. Meisel et al., 102 Mich. 357, 60 N. W. 773, 32 L. R. A. 92.

[9] The claim of plaintiffs, however, is not based upon their right to withdraw from a religious society organized in good faith for religious purposes. On the contrary, it is averred that they were induced by fraud and fraudulent representation to believe that the Israelite House of David was organized for the advancement of the Kingdom of God and for the purpose of teaching and promulgating the religious faith publicly taught by it; that they were likewise induced to believe that Benjamin, the founder of this religion, was the "Seventh Messenger, the Seventh Angel, the Second Child of the Son of Man, who comes with the seventh key to unlock the mysteries of godliness"; that, so believing, they subscribed to the membership agreement, transferred to Benjamin and Mary title to all their property and effects, yielded implicit obedience to Benjamin and labored industriously for many years, for the benefit and enrichment of this community, without compensation other than the things absolutely necessary to their existence. They further aver, in substance and effect, that these representations were false and fraudulent, and known to be false and fraudulent by Benjamin and Mary and others in the "inner circle," in that the Israelite House of David is not a religious association organized in good faith for religious purposes, but, on the contrary, it was organized by its founders, Benjamin and Mary, and Benjamin in particular, for fraudulent, unlawful and immoral purposes, and in so far as it proclaims a definite religious doctrine, and purports to teach publicly a moral code, it is for the fraudulent and corrupt purpose of borrowing the cloak of religion to disguise its true purposes and corrupt motives, and particularly for Benjamin's private gain, to afford him opportunities for the gratification of his lust, and to shield and protect him in criminal and licentious practices with the young girls and young women members of this organization.

This action is not and does not purport to be an attack upon a religious faith, but, on the contrary, an attack upon an attempt to prostitute that faith to irreligious and base purposes through the instrumentality of a so-called religious society, ostensibly organized for the furtherance of the faith, but in fact organized under guise of religion for wicked, lewd, licentious, and unlawful purposes. This, of course, does not mean that any individual may be deprived of his constitutional right to worship God in accordance with the dictates of his own conscience, nor that a court will assume to determine the truth or error of any religious creed or dogma; but it does mean that no individual, or group of individuals, will be permitted to deceive and defraud others through and by false and fraudulent representations made under color of religion, no matter what that religion may be or under color of any other lawful purpose. It is undoubtedly true that the criminal or indecent conduct of one or more members of a religious organization is not sufficient cause for another member to withdraw therefrom and demand a restoration of the property he has contributed, for there are hypocrites and criminally disposed individuals in every religion; but it is alleged in this bill of complaint, and the evidence tends to prove, that Benjamin was not only the founder and expounder of this faith, but that he organized this society; that he is the absolute master of its activities and dominates both its spiritual and temporal affairs.

If, therefore, this society was not in fact organized by Benjamin for religious purposes; if it was clothed with a religious garb merely to conceal a sinister motive; if it was organized by Benjamin for private gain, or fraudulent, corrupt, and criminal purposes; if Benjamin did not and does not believe, in good faith, that he is the Seventh Messenger in the line of succession, of which line he claimed Johanna Southcote, of England, was the first, and John Wroe was the fifth; if his pretensions to piety and righteousness are but sham and hypocrisy, to deceive and defraud others in joining this society and contributing their means and their labor thereto— then, notwithstanding the alleged fraud and fraudulent representations upon which plaintiffs rely for recovery occurred many years after the society was organized, and many people had, in good faith and for proper purposes, become members thereof, the initial fraud permeates the entire structure, and is perpetuated by Benjamin's continuing fraudulent misrepresentations, either in person or by his agents and representatives, and by his continuing control and dominance of its affairs. That other members of this society, and the officers through whom Benjamin exercises control of its affairs, may be in good faith and entirely honest in their acceptance of the religion proposed and publicly taught by Benjamin, can avail nothing, if these officers and members alike are subject to the unquestioned authority and autocratic control of Benjamin. Under such a state of facts the officers and members of this society, though they be ignorant thereof, are nevertheless part and parcel of the plan and machinery by which and through which it is claimed Benjamin accomplishes his corrupt, criminal, and fraudulent purposes.

It follows, therefore, that their good faith and honest purpose cannot shield Benjamin or the society he has organized and controls from civil liability to those who have been so defrauded of property or the fruits of their labor. If the other members have likewise been defrauded, they are entitled to like redress. They could have intervened in this case for the equal and equitable protection of their rights, but they have not intervened, and therefore must abide the result, even though the payment of the amount found due to plaintiffs should exhaust the property of Benjamin, Mary, and the House of David.

Upon the material facts in controversy there is a serious and irreconcilable conflict in the evidence. The burden is upon the plaintiffs to establish by proof the material facts alleged in their bill of complaint. In determining whether the plaintiffs have done this, it is wholly unnecessary to review the testimony in detail. A great part of it is filthy, obscene, and wholly unfit for publication. It is sufficient to say that the plaintiff offered evidence tending to prove that Benjamin and Mary were not holy and pious people, intent only upon the advancement of the Kingdom of God, the salvation of souls, and the immortal life of the body, as they pretended and represented themselves to be; that Benjamin in particular was guilty of the most disgusting and revolting crimes against the chastity of young girls who were members of this community; that he accomplished the debauchery of these young girls by and through his further interpretation of the faith, which interpretation was not publicly taught, but communicated only in private to the "inner circle," and in particular to the young girls whom he purposed to make the victims of his lust, by quotations from the Bible, by his representations, in which they implicitly believed, that he was the "Seventh Messenger, the Second Child with the covenant of life—the last covenant which unseals the tree of life to man, for the immortal life of the body, who shall receive the immortal soul from the woman in Jerusalem," by his declarations and claims that sexual intercourse with him was not sinful, but a means by which they might be cleansed and receive immortal life of the body, and an act evidencing faith and obedience to Benjamin the "Seventh Messenger sent to gather the elect together and prepare their bodies to receive the Kingdom of God."

In the experience of the human family there are no meaner, more contemptible, or more despicable methods of accomplishing the debauchery of womanhood than the methods described by these witnesses, and which they testified were employed by Benjamin in the accomplishment of the ruin of these young girls who had been raised from childhood in this colony and had been taught to believe that Benjamin was a divinely inspired messenger to whom they must yield unquestioned obedience. If this testimony is true, it necessarily follows that Benjamin is a fraud and an imposter, a modern satyr of unspeakable lust, and wholly unfit to organize and control a religious society of any faith through the instrumentality of which he may prey upon the innocent and unsuspecting, prostitute woman-

hood to his lewd and licentious purposes, and hide his own rottenness under a cloak of righteousness. It would seem unnecessary to say that an association organized, dominated, and prostituted to the unholy purposes of such a man is not a religious society, no matter what its pretensions may be, and is not entitled to any of the rights, privileges, or considerations of a society which in truth and in fact has been organized for religious purposes and teaches privately, as well as publicly, a code of morals consistent with law and public policy. If, on the other hand, this testimony is not true, then the plaintiffs and their witnesses are engaged in as mean and contemptible a conspiracy against religious freedom and the defamation of character as ever blackened and defiled the records of a court of justice.

The evidence of the plaintiffs also tended to prove that Benjamin, for his own protection from criminal prosecution, not only counseled these girls to commit perjury in case they were called upon to testify in a court of justice as to what was transpiring in this colony, but also taught them how and in what manner they should answer any question propounded to them in reference to their relation with him; that in this connection they should testify "of things to come as if they were," and "of past transactions as if they were not."

The evidence also tends to prove that the Hansels, at the time they entered the House of David and signed the membership agreement, had no knowledge whatever of Benjamin's conduct with these girls, or that this society was organized for any purpose whatever other than the propagation of the faith as declared in the published writings of Benjamin and in the articles of faith adopted by this society; that, relying upon the false and fraudulent representations made by Benjamin in his published writings and through and by his agents that Benjamin was the "Seventh Messenger, the Seventh Angel, the Second Child of the Son of Godliness—God manifest in the flesh," they accepted the faith as publicly taught by Benjamin and the House of David, signed the membership agreement, contributed all of their property, and performed labor for the benefit of this community for more than eight years, during all of which time they conformed to the rules and regulations of the society and yielded implicit obedience to Benjamin both in temporal and spiritual affairs; that during all of this time they were but general members of

this society, and therefore had neither the knowledge nor the means of knowledge of what was transpiring within the "inner circle," and have not now any personal knowledge of these facts; that, about a week before they left the House of David, John Hansel acquired some information from others who claimed to know the facts in reference to the matters and things stated in the bill of complaint; that Margaret Hansel had no such information, and that at the time of her departure she believed, and perhaps still believes, in the faith as publicly taught by the House of David.

The evidence also tends to prove that, after Benjamin and the officers of the House of David discovered that John Hansel had received information from others as to Benjamin's true character and lecherous conduct, and the purposes for which this society was organized and the immoral uses to which it was being put, that means were employed by them to induce John Hansel to commit some overt act in violation of the rules and regulations and in defiance of Benjamin's authority, and, having in part accomplished this purpose, forcibly and wrongfully expelled them from the colony, without returning to them the property they had contributed, or any compensation for their labor while they were there, other than transportation to Nashville, Tenn., $100 in money, Hansel's carpenter tools, and some other personal effects of trifling value; that John Hansel was then compelled by threats of violence and personal injury and by threats of criminal prosecution to sign his own name and the name of his wife, Margaret Hansel, to the paper purporting to be a release by them of all claims whatever against the House of David for property contributed or labor performed.

Evidence was offered on behalf of the defendants directly contradicting all of the evidence offered on the part of the plaintiffs and further tending to prove that both Benjamin and Mary were pious, God-loving, and God-fearing people; that they were sincere in the faith founded by Benjamin; that neither had been guilty of any of the immoral acts or lecherous conduct alleged in the bill of complaint or described in the testimony of the witnesses for plaintiffs; that Benjamin had organized this religious society in good faith and solely for religious purposes; that Hansel himself was a vicious character; that he had threatened the life of Benjamin on more than one occasion, and had tried to induce others to

kill him; and that shortly before the Hansels left the colony they had entered into conspiracy with other members and ex-members of the colony for the purpose of defaming and disgracing Benjamin and Mary and destroying the House of David, and to induce certain female members of the colony to desert their husbands and join him in the establishing of a like colony at Nashville, Tenn.

While there is some evidence offered on the part of the plaintiffs in reference to Benjamin's conduct with the young girls of this community that this court would gladly disbelieve, nevertheless the trial court saw these witnesses, heard them testify, and had full opportunity to determine their credibility from their personal appearance, demeanor and manner of testifying. After hearing all of this evidence, that court found the issues of fact in favor of the plaintiffs, and entered a decree accordingly.

[10] This court, however, does not base its affirmance of that decree solely upon the fact that, where there is such a direct conflict in the evidence, the trial court is in better position to determine the truth than a reviewing court, that must rely upon the printed page. In addition to the testimony actually heard by the trial court, the fact remains that, although Benjamin was specifically charged with the commission of these criminal acts and Mary was specifically charged with criminal relations with at least one officer of the colony, nevertheless neither of these defendants took the witness stand to deny the truth of these charges. This is a civil action, and the failure of a party to testify to facts peculiarly within his knowledge, or to call witnesses within the jurisdiction of the court to contradict evidence of conversations had with them or in their presence, is a circumstance that cannot be overlooked.

[11] There is still another feature of this evidence that is entitled to more than passing consideration. Evidence was introduced tending to prove that both Benjamin and Mary Purnell were members of a colony organized by Michael Mills of Detroit, Mich. Mills occupied practically a similar relation to that colony that Benjamin sustained to this, and was convicted of like criminal practices with a young girl of that society. The career of the Mills colony ended with the prosecution of Mills for the debauchery of a girl 14 years of age. The history of that transaction is written in the opinion in People v. Mills, 94 Mich. 630, 54 N. W. 488. Mills accomplished the debauchery of young girls in his colony in substantially the same way that Benjamin is here charged with the ruin of young girls in this colony. Among other things Mills wrote to a child 14 years of age as follows: "Well, dear Bernice, come to me. You are requested by the living God of Abraham, Isaac, and Jacob, to come and place yourself in obedience to Michael, my son, as the last piece is now found, and you are that piece, the tenth piece in the God-Head." If the evidence offered on the part of these plaintiffs be true, then the Israelite House of David is largely the counterpart of the Mills colony. In other words, Benjamin was not only an apt pupil, but a true apostle, of the Mills cult.

It is claimed, however, that Benjamin and Mary were not members of the Mills colony; that the trial court ruled out all the testimony in relation thereto, and for that reason this evidence was omitted from the printed record. However that may be, there is printed in the record the testimony of Ester Hansel to the effect that Benjamin told her about the Michael Mills colony; that he also told her both Mary and himself had joined the Mills colony, and that he (Benjamin) had been a pillar in the Mills church. Neither Benjamin nor Mary took the trouble to deny these statements. In the opinion of this court, this testimony was pertinent as tending to prove, not only previous environment, association, and habit of thought, but it was particularly pertinent as tending to prove familiarity and knowledge of similar plans and procedure. Standing alone, these facts are unimportant, but they are facts and circumstances in Benjamin's life and career that a court should take into consideration in determining this controversy. Wellman v. U. S. (C. C. A.) 297 Fed. 925.

There is also a serious conflict in the evidence in reference to the circumstances and conditions that obtained when John Hansel and his children signed the paper writing purporting to be a release of all their interests in and to the property of the House of David at the time the Hansels left the colony. In view of the fact that the original contract of membership is void, it is wholly unimportant whether the Hansels voluntarily retired or were forcibly expelled from this community. But it is important whether John Hansel voluntarily signed this release, or was compelled to do so through fear of personal injury or threats of malicious prosecution. Upon this question there is substantial evidence tending to

support the finding of the trial court, and we are not disposed to disturb that finding, especially in view of the fact that neither John nor Margaret Hansel then had any personal knowledge of Benjamin's criminal conduct or. that the representations made to them at the time they signed the membership agreement were false and fraudulent. It is true that John Hansel at that time had heard some reports in reference thereto, but the major part of the testimony upon which he now relies was obtained by plaintiffs since they left the colony.

It is also insisted that the recovery allowed plaintiffs by the trial court is largely excessive. John and Margaret Hansel contributed over $5,000, and upon the facts found they are entitled to recover that amount with interest. John Hansel is a carpenter by trade. He testified that he was foreman of construction in the erection of a large number of the more important buildings of the colony; that since the beginning of the World War he could have earned at his trade $7.50 a day. There is also evidence tending to prove that Margaret Hansel and their minor children performed services for this community that were of substantial value. The District Court specifically found the value and amount of each particular item that should be included in the aggregate. These amounts do not appear to be excessive or unwarranted by the evidence.

This record contains 41 assignments of error. It would be impractical and unprofitable to discuss each in detail. All of these assignments, however, have been fully considered by this court.

For the reasons stated, the decree of the District Court is affirmed.