Utica Mutual Ins. Co. v. Fireman's Fund Inc. Co.

# In the
# United States Court of Appeals
## For the Second Circuit

_____

August Term 2019

No. 18-828

UTICA MUTAL INSURANCE COMPANY,

*Plaintiff-Counter-Defendant-Appellee,*

v.

FIREMAN'S FUND INSURANCE COMPANY,

*Defendant-Counter-Claimant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of New York
No. 6:09-CV-853, David N. Hurd, District Judge, Presiding.
(Argued August 29, 2019; Decided April 28, 2020)

Before:     POOLER, PARKER, and RAGGI, *Circuit Judges.*

Appellant Fireman's Fund Insurance Company appeals from a judgment of the United States District Court for the Northern District of New York (David N. Hurd, *Judge*), awarding $64 million to Appellee Utica Mutual Insurance Company following a jury trial. The jury found that Fireman's Fund breached its obligations under reinsurance contracts issued to Utica. On appeal, Fireman's Fund argues that the reinsurance contracts, by their terms, demonstrate as a matter of law that Fireman's Fund did not owe to Utica the obligations allegedly breached. We agree, and we **REVERSE**.

————

WILLIAM M. SNEED (Thomas D. Cunningham, *on the brief*) Sidley Austin LLP, Chicago, Ill., *for Plaintiff-Counter-Defendant-Appellee*.

PETER R. CHAFFETZ (Steven C. Schwartz & Erin E. Valentine, *on the brief*), Chaffetz Lindsey LLP, New York, N.Y., *for Defendant-Counter-Claimant-Appellant*.

————

BARRINGTON D. PARKER, *Circuit Judge*:

Fireman's Fund Insurance Company ("Fireman's Fund") appeals from a judgment of the United States District Court for the Northern District of New York (David N. Hurd, *Judge*), awarding breach-of-contract damages and interest to Utica Mutual Insurance Company ("Utica") following a jury verdict in Utica's

favor. The contractual claim arose from seven reinsurance contracts that Fireman's Fund issued to Utica, each reinsuring umbrella policies that Utica issued to Goulds Pump, Inc. ("Goulds"), a pump machinery company. Each of the seven reinsurance contracts contains a "reinsurance certificate," which provides that Fireman's Fund's liability follows from Utica's liability consistent with the terms of the umbrella policies. The umbrella policies, in turn, provide that "[Utica] shall be liable only for the ultimate net loss resulting from any one occurrence in excess of . . . the amounts of the applicable limits of liability of the underlying insurance as stated in the Schedule of Underlying Insurance Policies." The "underlying insurance" for the seven umbrella policies were seven primary insurance policies that Utica also had issued to Goulds.

In 2003, Utica and Goulds were embroiled in a dispute regarding coverage for asbestos bodily injury claims arising from exposure to Goulds' products. Among the disputed issues was whether Goulds' primary policies for certain years included aggregate limits (i.e., a maximum amount payable under the primary policy) for bodily injury claims. Utica and Goulds settled in 2007. They agreed, among other things, that each of Goulds' primary policies from 1966 to 1972, which are missing, contained such an aggregate limit. They also agreed that

3

Goulds' umbrella policies, purchased as excess coverage, would cover losses that exceeded the agreed primary policies' aggregate limit for bodily injury claims.

In 2008, Utica sought recovery from Fireman's Fund under the reinsurance policies it had issued to Utica. Utica argued, among other things, that language in the reinsurance policies bound Fireman's Fund to the terms of the settlement between Utica and Goulds. The case proceeded to a jury trial at which Utica prevailed and was awarded damages.

Fireman's Fund appeals and argues that by their terms, the umbrella policies provide coverage only for losses that exceed the limits stated in the Schedules of Underlying Insurance Policies (the "Schedules") included in the umbrella policies. Fireman's Fund contends that because no aggregate limits for bodily injury claims were stated in the Schedules, it had no obligation under its reinsurance policies to pay for losses that did not exceed the specific bodily injury limits that were listed in the Schedules. We agree and reverse.

**BACKGROUND**

The pertinent facts are not in dispute. From 1966 to 1972, Utica issued seven primary policies and seven umbrella policies to Goulds. Primary insurance policies provide "the first layer of insurance coverage" when a "policy-defined

liability or loss" occurs. *Ali v. Fed. Ins. Co.*, 719 F.3d 83, 90 (2d Cir. 2013). The primary insurance policies that Utica issued to Goulds are now missing.

Utica also issued to Goulds seven umbrella policies as excess coverage, each with a $10 million coverage limit. Umbrella insurance policies provide excess insurance; in other words, they provide an additional layer of coverage after a predetermined amount of primary coverage has been exhausted. *Id.* Unlike the primary policies, the umbrella policies are not missing and provide that "[Utica] shall be liable only for the ultimate net loss resulting from any one occurrence in excess of . . . the amounts of the applicable limits of liability of the underlying insurance as stated in the Schedule of Underlying Insurance Policies." *E.g.*, App'x at 1661.

The Schedules are identified in the declaration pages that accompany each Utica umbrella policy. Two categories of coverage are listed in the Schedules:  a category for bodily injury claims and a category for property damage claims. Different limits of liability are provided for each category:  per occurrence limits, per person limits, and aggregate limits. Generally, a per occurrence limit refers to the maximum amount an insurer will pay for a claim arising out of a single "occurrence." Under the umbrella policies, "occurrence" is defined as:

5

"(a) an accident during the policy period or (b) continuous or repeated exposure to conditions during or prior to the policy period, if the bodily injury or property damage occurs during the policy period and is neither expected nor intended by the [i]nsured." *E.g.*, App'x at 1661. A per person limit represents the maximum amount an insurer will pay per person for a covered occurrence. An aggregate limit refers to the maximum amount an insurer will pay, regardless of the number of occurrences for which the insured is considered liable.

In this case, it is undisputed that the seven umbrella policies at issue provide aggregate limits only for property damage claims. For example, the Schedule for the 1966-67 umbrella policy lists a $100,000 per person limit and a $300,000 per accident limit for bodily injury claims and a $50,000 per accident limit and a $100,000 aggregate limit for property damage claims. App'x at 1659. While some of the Schedules for different years list different monetary amounts (e.g., the Schedule for the 1971-72 umbrella policy contains a $300,000 per person and a $300,0000 per occurrence limit for bodily injury), none of the Schedules lists an aggregate limit for bodily injury:  the only aggregate limits on any of the Schedules in question are for property damage.

For example, the 1966-67 Umbrella Policy Schedule provides:

| Item 7. Schedule of Underlying Insurance Policies | | | LIMITS | | |
| POLICY NO. | POLICY PERIOD | TYPE OF POLICY | BODILY INJURY | PROPERTY DAMAGE | INSURER |
| --- | --- | --- | --- | --- | --- |
| V 177928 | 7-1-66 to 7-1-67 | Workmen's Compensation | as provided by law | | Utica Mutual Insurance Co. |
| 67137 LC | 7-1-66 to 7-1-67 | Comprehensive Liability including Automobile | 100,000 each person 300,000 each accident | 50,000 each accident 100,000 aggregate | Utica Mutual Insurance Co. |

ENDORSEMENT(S) ATTACHED HERETO: BE 710 (1) BE710 (2)
COUNTERSIGNED AT  DATE  BY
Utica, New York  6-21-66  HS  (Authorized Representative) TRANS. NO.
S-P-UL Ed. 1-64

App'x at 1659.

From 1966 to 1972, Utica also entered into seven reinsurance contracts with Fireman's Fund to reinsure a portion of each umbrella policy.[1] The reinsurance certificates for these contracts contain two provisions central to this litigation. The first provision, known as a "follow form" clause, provides that "the liability

---

[1] Under the reinsurance contracts, Fireman's Fund agreed to reinsure the upper $ 5 million out of each $10 million umbrella policy that Utica issued to Goulds. Utica purchased reinsurance from another carrier for the lower portion of the umbrella policies.

7

of [Fireman's Fund] . . . shall follow that of [Utica] and except as otherwise specifically provided herein, shall be subject in all respects to all the terms and conditions of [the umbrella policies]." *E.g.,* App'x at 1306. A follow form clause "signifies that the reinsurance contract incorporates by reference the terms and conditions of the reinsured policy." Barry R. Ostrager & Mary Kay Vyskocil, *Modern Reinsurance Law & Practice* § 2:03[a] (3d ed. 2014). In this case, the reinsured policies are the umbrella policies that Utica issued to Goulds.

The reinsurance contracts also contain a "follow-the-settlements" clause, which provides that "[a]ll claims involving this reinsurance, when settled by [Utica], shall be binding on [Fireman's Fund]." *E.g.,* App'x at 1306. When a reinsurance contract contains a "follow-the-settlements clause," the reinsurer (Fireman's Fund) must indemnify the reinsured (Utica) for the settled claim(s), as long as the settlement decision "is in good faith, reasonable, and within [the terms of] the applicable policies." *Travelers Cas. & Sur. Co. v. Gerling Glob. Reinsurance Corp. of Am.*, 419 F.3d 181, 190 (2d Cir. 2005) (citation omitted). Utica contends that this clause binds Fireman's Fund to its 2007 settlement with Goulds.

8

The primary and umbrella insurance policies became the subject of scrutiny when Goulds began facing thousands of claims alleging bodily injury from its products containing asbestos. Pursuant to its primary policies with Goulds, Utica defended and indemnified Goulds against those claims beginning in the 1980s. However, Goulds and Utica eventually came to dispute Utica's coverage obligations, which Utica contended had been exhausted by the payments it already had made in connection with asbestos-related claims. In 2003, Goulds and Utica filed competing declaratory judgment actions in California and New York state courts to resolve these coverage issues.

In the declaratory actions, Goulds alleged that many of its primary policies, specifically, its primary policies from 1978 to 1983, contained no aggregate limits for bodily injury. Therefore, Goulds contended, Utica was obligated to indemnify Goulds for all asbestos-related claims until other limits actually specified for those primary policies were reached. For its 1981-82 primary policy with Utica, for example, Goulds alleged that the primary policy had a $500,000 occurrence limit for bodily injury and property damage claims but no aggregate limit for those claims. Utica, on the other hand, contended that

9

these primary policies, including primary policies from 1978 to 1983, contained aggregate limits of liability that had been exhausted by its prior payments.

In February 2007, Goulds and Utica decided to settle the competing declaratory actions. Goulds agreed that each of its primary policies, including primary policies from 1966 to 1972, contained an aggregate limit for bodily injury claims, and that the primary policies' aggregate limits for bodily injury were exhausted by Utica's prior claim payments. Goulds and Utica also agreed that the "[a]vailable remaining insurance" to pay claims was $325 million, which would come from the umbrella policies it issued to Goulds. Potentially available at this point were the reinsurance policies Fireman's Fund had issued to Utica, although Utica contends that it did not become aware of these policies until July 2008. Under the "follow-the-settlements" clauses in the reinsurance policies, this settlement between Goulds and Utica would bind Fireman's Fund if it were "in good faith, reasonable, and within [the terms of] the applicable policies." *Travelers Cas. & Sur. Co.*, 419 F.3d at 190. Utica and Goulds filed with the courts overseeing their respective actions a proposed "Stipulation and Order" (the "Stipulation") dismissing the competing suits. The Stipulation stated that the parties' settlement was "fair, just, and reasonable; was resolved within the terms

10

of the primary and umbrella insurance policies issued by Utica Mutual to Goulds; and was otherwise entered . . . in good faith by the [p]arties." App'x at 2225. The judges in each action signed the Stipulation, which was filed on April 27, 2007.

In light of Utica's and Goulds' agreement that the primary policies were exhausted and the "follow-the-settlements" clauses in the reinsurance contracts, Utica sought reimbursement from Fireman's Fund under its reinsurance contracts for the years 1966 through 1972. Utica — which sent its first reimbursement bill to Fireman's Fund in September 2008[2] — sought $5 million for each year, for a total of $35 million. In 2009, by which time Fireman's Fund had not made any payments, Utica sued Fireman's Fund, alleging breach of the reinsurance contracts. Fireman's Fund denied liability, principally arguing that the umbrella policies were not triggered until the bodily injury losses exceeded the primary limits specified in the Schedules accompanying the umbrella policies, which had not occurred.

Whether the umbrella policies specified aggregate limits for bodily injury is at the heart of this litigation. Many of the bodily injury claims Utica paid out

---

[2] Utica states that at the time the Stipulation was entered, it was unaware of the Fireman's Fund reinsurance policies and did not discover them until July 2008.

11

were small and did not exceed the per person limits or the per accident/occurrence limits listed in the umbrella policies. If the umbrella policies contained aggregate limits for bodily injury, however, then Utica could total all the claims in a policy year, and, if their total surpassed the aggregate limits, trigger the umbrella coverage and potentially the reinsurance policies.

After discovery, Utica and Fireman's Fund filed multiple motions for summary judgment, which the District Court ruled on in 2015 and 2017. Ultimately, the District Court mainly denied the motions, concluding that neither side had submitted sufficient evidence to establish its position as a matter of law. *E.g., Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co.*, 238 F. Supp. 3d 314, 332–40, 343–47 (N.D.N.Y. 2017). A twelve-day jury trial ensued, which addressed, among other issues, whether Fireman's Fund was liable to Utica under the reinsurance policies and whether Fireman's Fund had an obligation to follow Utica's settlement with Goulds.

**The Jury Verdict**

At the close of both sides, the District Court instructed the jury as to Utica's breach of contract claim. The District Court instructed, among other things, that Utica "must establish by a preponderance of the evidence . . . that

12

Fireman's Fund failed to do what it was obligated to do under the reinsurance certificates." Trial Tr. at 1917. The District Court instructed the jury that "Fireman's Fund claims it is not obligated to pay under the reinsurance certificates because the 'follow the settlements' clause does not apply to [Utica's] reinsurance claims" and that under the "follow the settlements' clause . . . . Fireman's Fund carries the burden to show that the [clause] does not apply because [Utica's] settlement with Goulds was objectively unreasonable." *Id.* at 1917–19. The District Court further instructed the jury that it was only "being asked to decide whether Utica's . . . decision to settle with Goulds . . . was among the objectively reasonable options available to Utica."[3] *Id.* at 1919.

The jury returned a verdict for Utica on its breach of contract claim, finding, among other things, that Utica proved by a preponderance of the evidence that Fireman's Fund failed to do what it was obligated to do under the reinsurance contracts. After the jury verdict and after the District Court denied

---

[3] In arguing its point in summation, Utica highlighted the Stipulation, telling the jury that "judges both in New York and California issued [the Stipulation] finding that the settlement was fair, just, and reasonable within the terms of the policies . . . .  And they wrote that and they said that because that was the case, no matter what this reinsurer says." App'x at 1183.

13

Fireman's Fund's counterclaims[4] based on its own findings of fact, judgment was entered in favor of Utica, awarding $35,000,000 in contract damages plus $29,092,191.78 in pre-judgment interest. This appeal followed.

## DISCUSSION

## I.

On appeal, Fireman's Fund argues principally that the umbrella policies unambiguously provide that they apply only in excess of the limits stated in the Schedules accompanying the umbrella policies.[5] For the reasons that follow, we agree. Under well-settled New York law, which the parties agree governs this action, a contract "that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Glob. Reinsurance Corp. of Am. v. Century Indem. Co.*, 91 N.E.3d 1186, 1193 (N.Y. 2017) (citation omitted).

---

[4] Fireman's Fund counterclaimed for rescission based on Utica's alleged intentional and/or negligent rescission, but the District Court's ruling denying those counterclaims is not on appeal.

[5] Fireman's Fund further argues that (1) the District Court abused its discretion in admitting the Stipulation; (2) the jury instructions were erroneous; and (3) the District Court improperly calculated pre-judgment interest. Because we find as a matter of law that Fireman's Fund was not contractually obligated to pay for losses that did not exceed the bodily injury limits set forth in the Schedules, we need not address these arguments.

Moreover, in construing the contract, we are to "give full meaning and effect to the material provisions" of the contract, and "[a] reading of the contract should not render any portion meaningless." *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007) (citations omitted). If the "contract is reasonably susceptible of only one meaning, a court is not free to alter the contract." *Glob. Reinsurance Corp. of Am.*, 91 N.E.3d at 1193 (citation omitted); *see also Fiore v. Fiore*, 389 N.E.2d 138, 139 (N.Y. 1979) ("[C]ourts may not rewrite a term of a contract by 'interpretation' when it is clear and unambiguous on its face."); *Uribe v. Merchants Bank of N.Y.*, 693 N.E.2d 740, 743 (N.Y. 1998) (Courts may not "subvert[]" the plain meaning of a contract "by straining to find an ambiguity which otherwise might not be thought to exist." (citation omitted)).

In a reinsurance dispute, we do not abandon these principles. *British Int'l Ins. Co. v. Seguros La Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003). Therefore, the contracts at issue here—the reinsurance certificates and the umbrella insurance policies—will "be construed as we would construe any ordinary contract." *Id.*

With these principles in mind, we now turn to those contracts. The reinsurance certificates contain "follow form" clauses, which provide that Fireman's Fund's liability is subject to the terms and conditions of Utica's

15

umbrella policies. Consequently, we must determine whether the losses that

Utica and Goulds allocated to the umbrella policies in their settlement were

within the terms of those policies.

The reinsured umbrella policies provide that:

[Utica] shall be liable only for the ultimate net loss resulting from any one occurrence *in excess of . . .*

(a)     *the amounts of the applicable limits of liability of the underlying insurance as stated in the Schedule of Underlying Insurance Policies* less the amount, if any, by which any aggregate limit of such insurance has been reduced by payment of loss.

*E.g.*, App'x at 1661 (emphasis added). As an initial matter, it is undisputed that

the limits of liability listed in the Schedules for bodily injury do not include

aggregate limits. For example, the 1966–67 umbrella policy lists a $100,000 per

person and a $300,000 per accident limit for bodily injury, but no aggregate limits

are listed. *Id.* at 1659. On the other hand, it is undisputed that aggregate limits are

listed for property damage claims.

In the face of this contract language, Utica argues that aggregate limits for

property damage and bodily injury claims are not required to be stated in the

Schedules because the umbrella policies "called for only the underlying

occurrence limits to be scheduled, not underlying aggregate limits." Appellee's

16

Br. at 19. Utica contends that because the umbrella policy language discusses Utica's liability "resulting from any one occurrence," the phrase "applicable limits of liability" refers only to "occurrence limits," which Utica argues are the only limits that must be scheduled. On the basis of this reading, Utica maintains that it had a reasonable basis to allocate the bodily injury losses to the umbrella policies, even if the losses did not exceed the limits specified for bodily injury in the Schedules. We disagree.

Our reading of the umbrella policy language straightforwardly leads us to the conclusion that Fireman's Fund is liable only if the losses in question exceed limits "as stated in the Schedule[s]" accompanying the umbrella policies. *E.g.*, App'x at 1661. We begin with the definition of "occurrence," as set forth in the umbrella policies. The umbrella policies define an "occurrence" as the following:

(a) an accident during the policy period or

(b) continuous or repeated exposure to conditions during or prior to the policy period, if the bodily injury or property damage occurs during the policy period and is neither expected nor intended by the insured. All such bodily injury and property damage caused by continuous or repeated exposure to substantially the same general condition shall be deemed to be the result of one occurrence.

*Id.* (1966-67 Umbrella Policy). Here, it is undisputed that bodily injuries due to asbestos exposure from Goulds' products are covered occurrences. The

"applicable limits of liability" for these claims are those limits "as stated in the Schedule[s]" for bodily injury.

In the case of the 1966-67 umbrella policy, for example, the applicable limits for bodily injury are the $100,000 per person and $300,000 per accident limits. By contrast, if the occurrence were an accidental fire resulting in property damage, then the "applicable limits of liability" for those claims are the limits listed for property damage. It is therefore clear to us that the phrase "applicable limits of liability" refers to those limits applicable to the occurrence giving rise to Utica's liability. *See, e.g., U.S. Fire Ins. Co. v. Charter Fin. Grp., Inc.*, 851 F.2d 957, 961 (7th Cir. 1988) (noting, in case involving property damage claims, that the phrase "'total of the applicable limits of the underlying policies listed in Schedule A' . . . describes the dollar amount listed on Schedule A under 'general liability-property damage' as opposed to the other listed categories of primary insurance").[6] And as for the phrase, "as stated in the Schedule," this phrase

[6] *See Fried v. N. River Ins. Co.*, 710 F.2d 1022, 1026 (4th Cir. 1983) ("The term 'applicable limits,' in relation . . . to the Schedule A . . . refers only to the category of coverage applicable to the incident from which the insured's liability arises." (emphasis removed)); *Centennial Ins. Co. v. Naylor*, 7 F.3d 238, 1993 WL 382163, at *3 (7th Cir. 1993) (Table) ("We agree with plaintiff that the term 'applicable limits' means the amount listed on Schedule A for the respective insurance category or type. . . . It follows that this is the trigger point where [the insurer's] liability kicks in.").

18

plainly means that the reader should look to the Schedule to ascertain all the applicable limits for that occurrence.

New York courts have reached a similar conclusion. *See Liberty Mut. Ins. Co. v. Ins. Co. of State of Pa.*, 841 N.Y.S.2d 288, 290 (N.Y. App. Div. 2007) (construing the phrase "total amounts stated as the applicable limits of the underlying policies listed in the Schedule of Underlying Insurance" and explaining that the "policy limit set forth in the Schedule of Underlying Insurance annexed to the Liberty policy controls the triggering of Liberty's excess coverage"); *State Ins. Fund v. Int'l Ins. Co.*, 251 A.D.2d 86, 87 (N.Y. App. Div. 1998) (holding that the lower court "correctly construed" the phrase "total of the applicable limits of the underlying policies listed in Schedule A" as "the total of the amounts specified for each of the policies listed in Schedule A of the category of coverage applicable to the incident for which the parties' insured was sued").

Moreover, Utica's interpretation—that only occurrence limits must be listed—would render significant portions of the Schedules meaningless. *See Beal Sav. Bank*, 865 N.E.2d at 1213 ("A reading of the contract should not render any portion meaningless."). Under that reading, the aggregate limits listed for property damage in the Schedules would be superfluous, as would any other

19

non-occurrence limits that are provided in the Schedules (for example, per person limits). Indeed, the Schedules would serve very little purpose since, under Utica's approach, one could read into the Schedules limits not otherwise stated, even if doing so would directly contradict language in the umbrella policies.

Therefore, to give full meaning and effect to the phrase "applicable limits of liability," the phrase must refer to aggregate limits as well. That Utica repeatedly included on its Schedules aggregate limits for property damage but not for bodily injury claims lends further support to this conclusion. As the New York Court of Appeals has stated, "where an agreement is 'negotiated between sophisticated, counseled business people negotiating at arm[']s length, . . . courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include.'" *Glob. Reinsurance Corp. of Am.*, 91 N.E.3d at 1193 (quoting *Vermont Teddy Bear Co. v. 538 Madison Realty Co.*, 807 N.E.2d 876, 879 (N.Y. 2004)). Given the unambiguous language in the umbrella policies, Fireman's Fund had no obligation to pay for bodily injury claims that did not exceed bodily injury limits identified in the Schedules. *See Liberty Mut. Ins. Co.*, 841 N.Y.S.2d at 290 ("Th[e] Schedule lists the

20

AIG policy and attributes to it a $1 million per-accident limit of insurance. Even though it appears that the coverage afforded by the AIG policy may have been unlimited . . . , the policy limit set forth in the Schedule of Underlying Insurance annexed to the Liberty policy controls . . . .").

## II.

Utica further argues, however, that even if Fireman's Fund is not actually liable for Utica's losses, Fireman's Fund is obligated by the follow-the-settlements clauses in the reinsurance contracts to accept Utica's interpretation of the umbrella policies, as reflected in its 2007 settlement with Goulds. We are not persuaded.

A follow-the-settlements clause insulates a reinsured's liability determinations from challenge by a reinsurer, so long as the settlement decision was made "in good faith, reasonable, and within [the terms of] the applicable policies." *Travelers Cas. & Sur. Co.*, 419 F.3d at 190; *N. River Ins. Co. v. Ace Am. Reins. Co.*, 361 F.3d 134, 140 (2d Cir. 2004). Follow-the-settlements clauses, among other things, aid in "streamlin[ing] the reimbursement process" and "reduc[ing] litigation by preventing a reinsurer from continually challenging the propriety of

a reinsured's settlement decision." *Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London*, 760 N.E.2d 319, 328 (N.Y. 2001).

However, the doctrine has important limitations. For our purposes, the most important one is, as the New York Court of Appeals has indicated, that a follow-the-settlements clause "does not alter the terms or override the language of reinsurance policies." *U.S. Fid. & Guar. Co. v. Am. Re-Ins. Co.*, 985 N.E.2d 876, 882 (N.Y. 2013) (quoting *Travelers Cas. & Sur. Co.*, 760 N.E.2d at 328).[7] In *Travelers Casualty*, the question presented was "whether losses from environmental injury claims involving decades of commercial activities at numerous industrial and waste disposal sites may properly be aggregated as a single 'disaster and/or casualty' under certain reinsurance treaties." *Id.* at 321–22. The New York Court of Appeals answered that question in the negative, concluding "as a matter of law that Travelers' single allocations of its settlements . . . do not fall within the ambit of 'disaster and/or casualty' in the reinsurance treaties." *Id.* at 327–28. In

---

[7] *See also Travelers Cas. & Sur. Co.*, 419 F.3d at 193–94 ("It is well-established and not at all surprising that [a follow-the-settlements clause] does not require indemnification for losses not covered by the underlying policies. Thus, the reinsurer retains the right to question whether the reinsured's liability stems from a reinsured loss. A loss is unreinsured if it was not contemplated by the original insurance policy or if it was expressly excluded by terms of the certificate of reinsurance." (internal quotation marks omitted)).

22

doing so, the New York Court of Appeals rejected the cedent's argument that the follow-the-settlements clauses "found in the reinsurance treaties mandate that the Reinsurers reimburse it for losses it allocates to them reasonably and in good faith." *Id.* at 328. The Court reasoned that "[t]he practical result of such an application would be that a reinsurance contract interpreted under New York law that contains a [follow-the-settlements] clause would bind a reinsurer to indemnify a reinsured whenever it paid a claim, regardless of the contractual language defining loss." *Id.* at 329.

Here, Utica's theory directly contradicts the relevant language in the reinsurance contracts and umbrella policies. As *Travelers* and *United States Fidelity & Guarantee Company* hold, a reinsurer cannot be held accountable for an allocation that is contrary to the express language of the reinsurance policy. Utica's reading would essentially render the follow form clause in the reinsurance contract and the umbrella policy language defining Utica's loss meaningless and "would be contrary to the parties' express agreement and to the settled law of contract interpretation."[8] *Id.* at 328.

---

[8] In insisting that the 2007 settlement and Stipulation's allocation of losses was reasonable and within the scope of the follow-the-settlements principle, Utica emphasizes evidence that the primary policies it issued to Goulds had aggregate limits.

23

In reaching this decision, we do not ignore relevant follow-the-settlements authority. Our decision is congruent with a continuous line of authority establishing that, to trigger deference under the follow-the-settlements doctrine, the settlement decision in question must be reasonable and in good faith but must also be within the terms of the reinsured policy. *See, e.g., N. River Ins. Co. v. ACE Am. Reinsurance Co.*, 361 F.3d 134, 140 (2d Cir. 2004) ("[T]he follow-the-settlements doctrine does not bind a reinsurer to make payments outside the scope of its contractual obligations."); *Mentor Ins. Co. (U.K.) v. Brannkasse*, 996 F.2d 506, 517 (2d Cir. 1993) ("The [follow-the-settlements] principle does not change the reinsurance contract; it simply requires payment where the cedent's good-faith payment is at least arguably within the scope of the insurance coverage that was reinsured."); *Christiania Gen. Ins. Corp. v. Great Am. Ins. Co.*, 979

---

*See, e.g.*, Appellee's Br. at 46. Whatever the strength of that evidence, and whatever it may suggest about whether Utica and Goulds intended the umbrella policies to have such limits, that evidence is extrinsic to the umbrella policies. Although we are permitted to consider extrinsic evidence concerning the existence of aggregate limits in the umbrella policies "if [competing] interpretations . . . [are] reasonable on th[e] face" of those policies, *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 21 n.8 (2d Cir. 2018), that is not this case. As explained earlier, the umbrella policies are unambiguous, and the extrinsic primary policies cannot themselves create ambiguity. *See Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 769 F.3d 807, 815–16 (2d Cir. 2014) ("In New York, '[i]t is well settled that extrinsic . . . evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face.'" (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990)).

F.2d 268, 280 (2d Cir. 1992) ("[A] reinsurer is not obligated to indemnify for payments clearly beyond the scope of the original policy or in excess of its agreed-to exposure." (citation omitted)).

Of course, Fireman's Fund is not entitled to "de novo review of [Utica's] decision-making process." *N. River Ins. Co.*, 361 F.3d at 140 (citation omitted). For example, Fireman's Fund cannot obtain de novo review of Utica's claim liability determinations. Nor may Fireman's Fund seek de novo review of Utica's decision as to allocation. And, no doubt, follow-the-settlements will apply in many other disputes. However, where, as here, the relevant policy terms are unambiguous, a reinsured cannot insulate itself from the application of those terms under "follow-the-settlements."

**CONCLUSION**

To summarize, we hold that the umbrella policies unambiguously define their attachment point by reference to the underlying limits of liability "as stated in the Schedule[s]." Where the losses in question did not exceed the limits stated for bodily injury in the Schedules, Fireman's Fund had no obligation under the reinsurance contracts to pay for those losses. As we decide the case on these grounds, we do not reach the other issues raised by the parties, and we express

25

no opinion on them. The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion.