19-1241; 19-4335
Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.; Utica Mut. Ins. Co. v. Century Indem. Co.

# United States Court of Appeals
# for the Second Circuit

AUGUST TERM 2020
Nos. 19-1241; 19-4335

_____

UTICA MUTUAL INSURANCE COMPANY,
Plaintiff-Appellant,


v.


MUNICH REINSURANCE AMERICA, INC.,
Defendant-Appellee.

_____


UTICA MUTUAL INSURANCE COMPANY,
Plaintiff-Counter Defendant-Appellee,


v.


CENTURY INDEMNITY COMPANY,
Defendant-Counter Claimant-Appellant.[*]

_____


ARGUED: MAY 5, 2021
DECIDED: JULY 29, 2021

---

[*] The Clerk of Court is respectfully directed to amend the caption as set forth above.

Before:    JACOBS, RAGGI, CARNEY, Circuit Judges.

Plaintiff Utica Mutual Insurance Company, having paid asbestos losses incurred by its insured, sued to recover reinsurance from Defendants Munich Reinsurance America and Century Indemnity Company in two suits before different judges of the same court, with inconsistent results. Utica appeals from the judgment of the United States District Court for the Northern District of New York (Sannes, J., No. 19-1241) entered following a bench trial; and Century appeals from the judgment of the court (Hurd, J., No. 19-4335) entered following a jury trial. The appeals were heard in tandem. They primarily concern whether Munich and Century must reimburse Utica for defense costs in addition to limits of Utica's umbrella policies. Judge Sannes entered judgment for the reinsurer (there, Munich); Judge Hurd entered judgment for the reinsured, or cedent (Utica). Century also seeks a new trial on whether it is a counterparty at all to certain reinsurance, and on whether Utica breached a duty of good faith.

In No. 19-1241, we affirm; and in No. 19-4335, we reverse in part, vacate, and remand.

2

_____

SYED S. AHMAD, Hunton Andrews Kurth LLP,
Washington, D.C. (Patrick M. McDermott, Hunton
Andrews Kurth LLP, Richmond, VA, on the brief) for
Utica Mutual Insurance Company in 19-1241 & 19-4335.

BRUCE M. FRIEDMAN, Rubin, Fiorella, Friedman &
Mercante LLP, New York, NY (Alan J. Sorkowitz,
Crystal D. Monahan, Jason Eson, on the brief) for
Munich Reinsurance America, Inc. in 19-1241.

JONATHAN D. HACKER, O'Melveny & Meyers LLP,
Washington, D.C. (Tancred V. Schiavoni, Brad Elias,
Ashley E. Robertson, on the brief) for Century
Indemnity Company in 19-4335.

DENNIS JACOBS, Circuit Judge:

These interrelated reinsurance disputes, heard in tandem, arise from the 30-year insurance program of a manufacturer of products containing asbestos. Plaintiff Utica Mutual Insurance Company, having paid asbestos losses incurred by the manufacturer, sued to recover reinsurance from Defendants Munich Reinsurance America and Century Indemnity Company in two suits before different judges of the same court, with inconsistent results. The disputes concern a two-year segment of the insurance program, 1973 and 1974, in which Utica issued primary and umbrella coverage.

3

The umbrella coverage--the focus of these disputes--was $25 million per annual policy. Utica ceded parts of that risk to the defendant reinsurers, in exchange for a share of the premiums, via facultative certificates, i.e., a reinsurance contract particular to that policy. As to the 1973 umbrella policy, one-fifth was ceded to Munich; and one-fifth was ceded to Insurance Company of North America ("INA"), succeeded by Century. The 1974 umbrella policy was reinsured by a 1975 certificate that likewise assumed one-fifth of the risk. It is disputed whether INA--or a different company ("INA Re")--issued the 1975 certificate, and thus whether Century is liable on it as successor to INA.

The first issue on appeal is whether Munich's and Century's 1973 certificates reinsured for defense costs in addition to the umbrella policy limits. The second issue, concerning the 1975 certificate, is whether Century is entitled to a new trial to determine if it is the successor to INA Re and therefore liable on that certificate. The third issue is whether Century is also entitled to a new trial on a counterclaim against Utica for breach of a duty of good faith based on Utica's charging Century defense costs above the 1973 umbrella policy limits.

Utica sued Munich in the Northern District of New York (Sannes, J., No. 19-1241)[1]; and Utica sued Century in the same court (Hurd, J., No. 19-4335). With respect to whether defense costs are payable in addition to limits, the judgments in the two cases are opposite. Judge Sannes entered judgment in favor of the reinsurer, Munich, after a bench trial. Judge Hurd entered judgment in favor of the cedent, Utica, after a jury trial and denial of Century's motions for judgment as a matter of law. Judge Hurd also entered judgment in favor of Utica with respect to Century's successor status on the 1975 certificate, and with respect to Century's counterclaim.

On appeal, the cases were heard in tandem. We hold that the 1973 certificates reinsure defense costs within limits, not in addition. In that respect, we affirm Judge Sannes's judgment in No. 19-1241, and reverse Judge Hurd's judgment in No. 19-4335. As for the 1975 certificate, the overriding issue is whether Century is the successor to the company that underwrote the certificate. And on that issue, we vacate the judgment in view of trial errors, and remand for

---

[1] Munich filed its own, separate action, which was deemed related to and eventually consolidated with Utica's suit against Munich.

5

a new trial. The 1975 certificate, like the 1973 certificates and for the same reasons, pays defense within limits (as opposed to in addition)--a matter of importance here only insofar as Century is the successor to the reinsurer on the 1975 certificate. We also remand for a new trial on Century's counterclaim in view of our holding as to defense coverage.

## I.

The first issue is the same in both cases. Are the reinsurers (Munich and Century) obligated to reimburse Utica for defense costs in addition to limits?

Facts discussed in this Opinion are drawn from Judge Sannes's findings of fact, see Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc., 381 F. Supp. 3d 185 (N.D.N.Y. 2019), and the undisputed portions of the parties' pleadings and filings, see Citigroup Glob. Markets Inc. v. Abbar, 761 F.3d 268, 270 (2d Cir. 2014).

In 1973, Utica issued a $300,000 primary policy to Goulds Pumps, Inc., for defense and indemnity of personal-injury and other claims lodged against Goulds. Utica also issued an umbrella policy with an aggregate limit of $25

million. Originally, the umbrella policy paid defense costs within limits, i.e., treated investigation and litigation costs with respect to claims against Goulds as eroding stated policy limits; but the policy was endorsed in 1974 to provide defense in addition to limits for certain occurrences not covered by the primary policy. In other words, for those occurrences, only Utica's indemnity payments eroded the policy limit, whereas investigation and litigation costs were not subject to the cap. The 1973 primary and umbrella policies were two among many that Utica issued to Goulds between 1955 and 1986.

In the 1990s, Goulds faced a wave of asbestos litigation, which continued into the 2000s, and Utica began to defend and indemnify its insured under the primary policies. Coverage disputes that arose were settled in 2007, and Utica turned to its reinsurers for reimbursement on liabilities it allocated to the 1973 umbrella policy. Munich and Century each paid Utica $5 million for their undisputed one-fifth shares of the umbrella policy; but they refused to pay defense costs in addition to limits when Utica billed them an extra $2,760,534 each.

7

Utica presents three independent theories.  **A.** The 1973 umbrella policy, by reason of the 1974 endorsement, covers defense costs in addition to limits--a liability that the reinsurers must indisputably follow under the terms of the facultative certificates.  **B.** Alternatively, the 2007 settlement between Utica and Goulds requires the reinsurers to pay the billed defense costs.  **C.** In any event, the certificates independently obligate the reinsurers to pay the costs, notwithstanding what the umbrella policy requires.  We address each theory in the sections below.[2]

A bench trial was held in the suit against Munich, while the issue was put to a jury in the suit against Century.  After a bench trial, we review conclusions of law <u>de novo</u> and findings of fact for clear error.  <u>Bessemer Trust Co., N.A. v.</u>

---

[2] Utica urges us to reject as waived Century's arguments respecting interpretation of the 1973 umbrella policy and the 1973 reinsurance certificate, <u>i.e.</u>, theories A and C, despite Century's (unsuccessful) motions on these grounds, including its motion for summary judgment.  While a "party generally cannot appeal an order denying summary judgment after a full trial on the merits," we have recognized exceptions in "extraordinary circumstances." <u>Omega SA v. 375 Canal, LLC</u>, 984 F.3d 244, 252 (2d Cir. 2021).  We need not decide whether such circumstances are present here because waiver does not, in any event, preclude this Court from recognizing unambiguous language in a contract in dispute.

Branin, 618 F.3d 76, 85 (2d Cir. 2010).  We review de novo denials of motions for judgment as a matter of law after a jury trial.  Sanders v. N.Y.C. Human Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004).

We construe the umbrella policy and certificates like "any ordinary contract."  Utica Mut. Ins. Co. v. Fireman's Fund Ins. Co., 957 F.3d 337, 344 (2d Cir. 2020) (quoting British Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d Cir. 2003)).  A contract "that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms."  Glob. Reinsurance Corp. of Am. v. Century Indem. Co., 30 N.Y.3d 508, 519 (2017) (quotation omitted).  If the contract, read as a whole, "is reasonably susceptible of only one meaning, a court is not free to alter the contract."  Id. (quotation omitted).

Whether a contract is ambiguous is a question of law, as is the meaning of an unambiguous contract.  See JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).  Ambiguous language is that which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of

9

the customs, practices, usages and terminology as generally understood in the particular trade or business." Revson v. Cinque & Cinque, P.C., 221 F.3d 59, 66 (2d Cir. 2000) (quoting Seiden Assocs. v. ANC Holdings, Inc., 959 F.2d 425, 428 (2d Cir. 1992)).  The import of extrinsic evidence used to interpret an ambiguous contract is a question of fact.  JA Apparel, 568 F.3d at 397.

## A.

Does the 1973 umbrella policy, as modified by the 1974 endorsement, cover defense costs in addition to limits?

The 1973 umbrella policy, like other such policies, provides vertical and horizontal coverage.  Its vertical coverage rests on top of the 1973 primary policy, insuring against the same categories of risks covered by the primary policy with additional limits if losses exceed the primary policy limits.  This excess coverage is thus triggered by exhaustion of the primary limits.  The horizontal, or "drop down," component affords primary coverage in the first instance for categories of risks not covered by the underlying primary policy, and does not depend upon exhaustion of the primary limits.  Thus, the umbrella policy "blend[s]

10

primary and excess coverage by providing last-resort excess coverage as well as gap-filling primary coverage on claims not otherwise insured by primary policies." Utica Mut. Ins. Co. v. Clearwater Ins. Co., 906 F.3d 12, 15 (2d Cir. 2018).

The cases here involve the excess coverage. The primary policy covered the asbestos claims. Once that coverage exhausted, the excess coverage of the umbrella policy began to provide defense and indemnity, the question being whether defense costs eroded the umbrella policy limits, or were supplemental to them. It is undisputed that the umbrella coverage paid defense in addition to limits for those risks not covered by the primary policy, i.e., on the horizontal, drop-down coverage. That is because an endorsement in 1974 so specified.

Utica argues that the 1974 endorsement to the umbrella policy made defense supplemental for the vertical, excess coverage as well. But we agree with Judge Sannes that the endorsement unambiguously does not apply to the excess coverage.

The endorsement relied on by Utica provides that the 1973 umbrella policy pays defense costs in addition to limits, but only "[w]ith respect to any

occurrence not covered by" the 1973 primary policy:

> With respect to any *occurrence not covered by the underlying policy(ies) of insurance . . .* , but covered by the terms and conditions of this policy . . . [Utica] shall: (a) defend any suit against the insured . . . [and] (c) pay all expenses incurred by the company . . . . and the amounts so incurred, except settlements of claims and suits, are payable by the company in addition to the applicable limit of liability of this policy.

J. App'x 532, No. 19-1241 (emphasis added). The phrase "occurrence not covered by" unambiguously refers to the umbrella policy's drop-down coverage of risks that were not already insured under the primary policy. For example, the umbrella policy insures "mental injury" and "false arrest" while the primary policy does not. Id. at 196, 517. The endorsement does not bear upon the excess coverage of bodily injury, which includes asbestos injury.

We first consider the policy language. The umbrella policy and its endorsement use similar wording to reference the drop-down coverage. The parties agree that the umbrella policy defines its drop-down coverage as such coverage as is afforded when the "insurance afforded by [the primary policy] is inapplicable to the occurrence." Id. at 517. "Occurrence" means an "accident during the policy period," or a "continuous or repeated exposure to conditions"

12

when "the bodily injury or property damage occurs during the policy period."

Id. And "inapplicable"--although not defined in the contract--plainly means

there is no underlying primary insurance for the occurrence.

Likewise, an "occurrence not covered by the underlying policy(ies) of

insurance" refers to a risk that is outside the scope of the primary policy, as

Judge Sannes concluded. See Munich, 381 F. Supp. 3d at 211–12. "Covered" is a

term of art that usually describes a risk that is insured. See N.Y. Univ. v. Cont'l

Ins. Co., 87 N.Y.2d 308, 323 (1995) (citing Albert J. Schiff Assocs., Inc. v. Flack, 51

N.Y.2d 692, 697–98 (1980)) (defining "coverage" as "the net total of policy

inclusions minus exclusions"); In re Joint E. & S. Dist. Asbestos Litig., 993 F.2d

313, 314 (2d Cir. 1993) (defining "coverage" as "the amount and extent of the risk

. . . contractually assumed, as specified in the insuring clause and exclusions").

Correspondingly, "not covered" refers to risks that are uninsured.

The use of the term "covered" in the umbrella policy is unexceptional. The

policy denotes the risk insured as: "Coverage A - Personal Injury Liability" and

"Coverage B - Property Damage Liability." Id. And it defines the "Ultimate Net

Loss" as that which the insurer must pay "as a consequence of any occurrence

13

covered." Id. In this context, "covered" refers to insured risk, and there is no

reason to give the term a different meaning in the endorsement. "[Facultative]

certificates are usually standard forms, short and concise, using terms of art

rather than lengthy, legalistic explications to define the obligations of the

parties." Glob. Reinsurance, 30 N.Y.3d at 513 (quotations omitted). The rule is a

corollary of the general principle: "[t]erms in a document, especially terms of art,

normally have the same meaning throughout the document in the absence of a

clear indication that different meanings were intended." Maryland Cas. Co. v.

W.R. Grace & Co., 128 F.3d 794, 799 (2d Cir. 1997).

Utica argues that an occurrence is "not covered by" the primary policy

once the primary exhausts. But neither the umbrella nor the primary policy

suggests that an occurrence is no longer a "covered" risk after exhaustion; what

ceases is the obligation to pay for liabilities arising from the risks that are

covered.[3] The phrase "not covered" in the endorsement is consistent with the

---

[3] The umbrella policy provides excess coverage when underlying "amounts" run out, i.e., when "the ultimate net loss resulting from any one occurrence [is] in excess of . . . the amounts of the applicable limits of liability of the [primary policy] as stated in the Schedule." J. App'x 517, No. 19-1241. The relevant

14

umbrella policy: it delineates uninsured risks and is not a function of exhaustion.

See also Pergament Distribs., Inc. v. Old Republic Ins. Co., 128 A.D.2d 760, 761 (2d Dep't 1987) ("[T]he terms 'covered' and 'not covered' refer to whether the policy insures against a certain risk not whether the insured can collect on an underlying policy.").

Utica's construction erases parts of the endorsement. See Beal Sav. Bank v. Sommer, 8 N.Y.3d 318, 324 (2007) ("A reading of the contract should not render any portion meaningless."). If the endorsement paying defense in addition to limits applied to both the drop-down and the excess coverages, there would be no need to specify that it applies when an occurrence is "not covered by" the primary policy. It would have been enough that it applies to occurrences "covered by the terms and conditions of this [umbrella] policy." J. App'x 532, No. 19-1241. The phrase "not covered by" narrows the endorsement, and

---

passage in the primary policy is cast in terms of the payment obligation: Utica "shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements" for occurrences where the policy "applies." Id. at 2554.

15

narrows it to the drop-down feature of the umbrella. Accordingly, we hold that the 1974 endorsement does not change the 1973 umbrella policy's coverage of the asbestos claims to provide for defense in addition to limits.

**B.**

Does the 2007 settlement between Utica and Goulds require the reinsurers to pay Utica's billed defense costs?

Utica argues that under follow-the-settlements doctrine, the reinsurers must accept Utica's decision to allocate to the 1973 umbrella policy all defense costs in addition to limits. This decision is purportedly reflected in the 2007 settlement between Utica and Goulds, which resolved the following dispute (among others). Utica had taken the position that the primary policies had aggregate limits, and it sought to allocate ongoing losses and defense costs to the umbrella policies (which were reinsured). Goulds contended that the primary policies had no aggregate limits, in effect creating infinite coverage of asbestos claims, which Utica would bear--a situation that was financially untenable. So the parties entered a coverage-in-place settlement agreement in 2007.

16

The agreement fixed Utica's defense and indemnity obligations across the whole insurance program. The program would continue to pay claim-by-claim (as opposed to Utica paying a lump-sum settlement to Goulds). Goulds agreed that the primary policies had aggregate limits, and that those limits were exhausted. Utica agreed to "reset the umbrella policies' available limits to zero." Munich, 381 F. Supp. 3d at 196. The umbrella policies were thus deemed "unimpaired" as of January 1, 2006 (the effective date of the settlement), notwithstanding allocations Utica had made to the umbrella policies before the settlement. Utica further agreed to absorb $25 million in orphan share payments--payments outside the time period of any policy it had issued.

Significantly for present purposes, the agreement specified that the 1973 (and 1974) umbrella policies each had an aggregate limit of $25 million, and that defense costs were payable within limits. Across all 17 umbrella policies in the program, it was agreed that coverage totaled $325 million (reflecting an increase in the limits of several umbrella policies not at issue here in exchange for treating umbrella policy limits as including defense costs). Thus the settlement allocated

17

pre-settlement payments to the primary policies, and Utica began to defend and indemnify Goulds under the unimpaired umbrella policies.

After the settlement with Goulds was executed, Utica discovered the 1974 endorsement, which Utica contends (in this reinsurance litigation) amended the 1973 umbrella policy to pay defense costs in addition to limits. Neither Utica nor Goulds, however, sought to reopen the settlement as a result. Nor would it have benefited Utica to do so. Indeed, at Century's trial, a Utica claims attorney testified that, following discovery of the endorsement, she felt the "settlement with Goulds" was made "even better" from Utica's perspective, because Utica could now bill its reinsurers for defense costs in addition to limits (under the endorsement) yet its own liability to Goulds was limited to payment of defense costs within limits (under the settlement). As Utica continued to pay losses and costs after the settlement and pursuant to its terms, it reached the $25 million aggregate limit on the 1973 umbrella policy. Utica billed Century and Munich accordingly, for $5 million each, which they paid. But, citing the endorsement, Utica allocated defense costs to the 1973 umbrella policy above its limit on the theory that the charge was allowed by the endorsement. (These costs appear to

18

have first been paid pre-settlement or under other umbrella policies, presumably

charged against the limits of those policies, and then re-allocated to the 1973

umbrella policy.)  When Utica billed Century and Munich for the additional

costs, both reinsurers balked, thereby precipitating this dispute.  Utica argues

that the reinsurers must accept this allocation because it resulted from Utica's

2007 settlement with Goulds, notwithstanding what the umbrella policy itself

demands.  This argument fails.

True, when a reinsurance certificate contains a follow-the-settlements

clause,[4] the reinsurer cannot question allocation decisions made after a

settlement between the cedent and policyholder if the settlement "is in good

faith, reasonable, and within the applicable policies."  Travelers Cas. & Sur. Co.

v. Gerling Glob. Reinsurance Corp. of Am., 419 F.3d 181, 190 (2d Cir. 2005) (citing

N. River Ins. Co. v. Ace Am. Reinsurance Co., 361 F.3d 134, 140 (2d Cir. 2004)).

But this assumes that the cedent's billing to its reinsurers is at least consistent

---

[4] The Century certificate has such a clause.  The Munich certificate does not; but
Utica contends that one should be implied.  (Judge Sannes held that no clause
could be implied, which Utica appeals.)  For purposes of argument only, we
assume the Munich certificate has one as well.

19

with, and does not contradict, its performance of the settlement. Not so with

Utica's performance.

The 2007 settlement treated the 1973 umbrella policy as paying defense

costs within limits (specifically, "[t]he payment by Utica Mutual of Defense Costs

and allocation of such Defense Costs to a particular Goulds Umbrella Policy

Period will erode that Policy Period's Unimpaired Limits"). J. App'x 2215, No.

19-4335. This settlement term contradicts Utica's present contention that the

reinsurers must reimburse defense costs *in addition to* the umbrella policy limits.

On the settlement's own terms, Utica's allocation is invalid.

Utica's argument fails on another front. Its allocation, irrespective of what

the 2007 settlement authorized, is outside the terms of the 1973 umbrella policy.

Fireman's Fund, 957 F.3d at 348. The umbrella policy, as we hold above, covers

defense costs within limits on the asbestos claims. The Century and Munich

certificates reinsure the same because they have "follow form" clauses. These

clauses link the reinsurers' liabilities to Utica's obligation under the umbrella

policy, meaning their liabilities must track Utica's. See id. at 341; Clearwater, 906

F.3d at 15; see also Glob. Reinsurance, 30 N.Y.3d at 513 ("[I]n facultative

reinsurance, the reinsurer agrees to indemnify the cedent for all or a portion of the cedent's risk under a single policy in the event of a loss.").

The certificates incorporate the obligation to pay defense costs within the stated limits on the asbestos coverage, not in addition. Century and Munich "cannot be held accountable for an allocation that is contrary to [this] express language" in their reinsurance policies. Fireman's Fund, 957 F.3d at 347; see also U.S. Fid. & Guar. Co. v. Am. Re-Ins. Co., 20 N.Y.3d 407, 420 (2013) ("[A] follow the settlements clause 'does not alter the terms or override the language of reinsurance policies.'" (quoting Travelers Cas. & Sur. Co. v. Certain Underwriters at Lloyd's of London, 96 N.Y.2d 583, 596–97 (2001)). "It is well-established and not at all surprising that follow-the-fortunes does not require indemnification for losses not covered by the underlying policies." Gerling, 419 F.3d at 193.

We hold, therefore, that the 2007 settlement agreement with Goulds does not independently require Century or Munich to pay defense costs in addition to limits.

## C.

Do the facultative certificates themselves require the reinsurers to reimburse the disputed defense costs regardless of Utica's own obligations under the 1973 umbrella policy?

Utica argues that it may bill the reinsurers for defense costs originally paid under other policies (or possibly no policy at all, if its reasoning is taken to its logical conclusion) because the certificates bind the reinsurers to pay all "expenses incurred" by Utica. The Munich certificate provides that Munich "shall be liable for its proportion of *allocated loss expenses* incurred by [Utica] in the same ratio that [Munich's] share of the settlement or judgment bears to the total amount of such settlement or judgment under the policy reinsured." J. App'x 1731, No. 19-1241 (emphasis added). "Allocated loss expenses" is defined as "all expenses incurred in the investigation, adjustment and litigation of claims or suits, but excluding the office expenses of [Utica] and the salaries and expenses of all employees of [Utica]." Id. To similar effect, the Century certificate provides that, as to "[a]ll claims involving this reinsurance, . . . [Century] . . . shall be bound to pay . . . its proportion of expenses, other than

22

[Utica] salaries and office expenses, incurred by [Utica] in the investigation and settlement of claims or suits." J. App'x 1204, No. 19-4335.

Utica's construction violates the contractual intent of facultative reinsurance.[5] The Munich and Century certificates connect the reinsurers' liability for "expenses incurred" to Utica's liability *under the 1973 umbrella policy*. Under New York law, to "incur" means "to become liable or subject to"; to incur a charge, one "must at some point be legally liable to pay that charge." Metz v. U.S. Life Ins. Co., 662 F.3d 600, 602 (2d Cir. 2011) (emphasis omitted). The certificates, which have follow-form clauses, specify in their declarations that the policy reinsured is the 1973 umbrella policy. See 1A Steven Plitt, et al., Couch on Ins. § 9:28 (3d ed. June 2021) ("By virtue of [a follow-form clause], the reinsurer's risk is limited to the risk involved in the original contract."). The only "expenses

---

[5] To the extent a panel of this Court, in an unpublished summary order, identified ambiguity, see Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc., 594 F. App'x 700, 704 (2d Cir. 2014), the decision is not controlling, see Jackler v. Byrne, 658 F.3d 225, 244 (2d Cir. 2011). We find, as the district court did, that the intrinsic contractual evidence is overwhelmingly persuasive. Moreover, we identify no error in the district court's finding that "[t]he parties' conduct further supports" the "conclusion" that the certificate does not independently obligate Munich to pay expenses in addition to limits. Munich, 381 F. Supp. 3d at 216.

23

incurred" that the reinsurers must reimburse are those that Utica is liable to pay under the 1973 umbrella policy (or good faith, reasonable settlements of disputes affecting that policy and within its terms).

Utica argues that what is "incurred" is not limited to Utica's liabilities under the umbrella policy. This improperly detaches the phrase "expenses incurred" from the specifically reinsured umbrella policy. The Munich certificate specifies that the ratio of Munich's liability for expenses tracks the ratio of its liability for loss "under the policy reinsured." J. App'x 1731, No. 19-1241. And the certificate refers to expenses as "loss expenses," linking them to the follow-form clause, i.e., to the "losses or damages which [Utica] is legally obligated to pay under the policy reinsured" that Munich "agrees to indemnify." Id. The certificate further specifies that "[t]he reinsurance provided . . . shall be payable" by Munich to Utica or any "liquidator, receiver, or statutory successor" of Utica *"on the basis of the liability of [Utica] under the policy reinsured."* Id. at 1732 (emphasis added).

Utica emphasizes that the wording of the Munich certificate obligates Utica "to investigate and defend claims or suits"; so, Utica argues, Munich

24

should have to pay expenses regardless of Utica's actual liability under the 1973 umbrella policy. J. App'x 1731, No. 19-1241. But that obligation is limited to "claims or suits *affecting this reinsurance*." Id. (emphasis added). The claims that affect the reinsurance are those that Utica is "legally obligated to pay under the policy reinsured," i.e., the umbrella policy. Id.

Similarly, the Century certificate limits Century's obligation to reimburse expenses to "[a]ll claims involving this reinsurance." J. App'x 1204, No. 19-4335. The reinsurance--including all conditions contained within the certificate--is "in respect of the [Utica] policy" being reinsured. Id. The certificate "reinsure[s]" the 1973 umbrella policy, incorporating the "terms and conditions" of that policy. Id. Thus Century's obligation to reimburse expenses tracks Utica's obligations under the umbrella policy. The follow-form clause is unequivocal: "the liability of [Century] specified in Item 4 of [the] Declarations shall follow that of [Utica]"; and Item 4 specifies the "Reinsurance Accepted" as the "Policy Limits and Application" of the umbrella policy. Id. at 1203. The only "expenses" that Century must reimburse are those "incurred" by Utica within the terms of the umbrella policy.

25

Utica's construction would have the reinsurers assume *more* risk than Utica did when it underwrote the 1973 umbrella policy. However, "absurd results should be avoided." Newmont Mines Ltd. v. Hanover Ins. Co., 784 F.2d 127, 135 (2d Cir. 1986). Facultative reinsurance is "policy-specific, meaning that *all or a portion* of a reinsured's risk under a specific contract of direct coverage will be indemnified by the reinsurer in the event of loss." Lloyd's of London, 96 N.Y.2d at 587 (emphasis added); see Clearwater, 906 F.3d at 15 ("A facultative reinsurer insures part or all of a single insurance policy."); see also Unigard Sec. Ins. Co. v. N. River Ins. Co., 4 F.3d 1049, 1054 (2d Cir. 1993); Glob. Reinsurance, 30 N.Y.3d at 513. Utica's construction would impermissibly impose liability on the reinsurers for risks "beyond the scope of its policy," Am. Ins. Co. v. N. Am. Co. for Prop. & Cas. Inc., 697 F.2d 79, 81 (2d Cir. 1982), and has no limiting principle.

## II.

With respect to the 1975 certificate, Century contends that it has no liability, full stop. Century was found liable for breach of contract as successor to the original issuer of the certificate, which Utica alleges was Insurance Company

26

of North America ("INA").  Although there is no dispute that Century is INA's successor, Century contends that a different company--INA Reinsurance Company ("INA Re")--issued the 1975 certificate, and that Century is not the successor to that company.  (There is no dispute that INA and INA Re are different companies.  The similarity of names is an unfortunate, confounding fact.)

As Judge Hurd correctly instructed the jury, Utica must prove that it "entered into the . . . 1975 reinsurance contract[] with Century" to recover the alleged unpaid balance of reinsurance.  J. App'x 634, No. 19-4335.  Utica had no copy of the certificate, but introduced two documents to prove the certificate's existence.  The first was a reinsurance binder letter from September 1975 summarizing the certificate's coverage and terms.  See Springer v. Allstate Life Ins. Co. of N.Y., 94 N.Y.2d 645, 649 (2000) ("[A]n insurance binder is a temporary or interim policy until a formal policy is issued.").  The second was a November 1976 letter asking Utica about payment of the premium owed to the reinsurer.  The documents, however, point in different directions.  They were written on "INA Reinsurance Company" letterhead and signed by INA Re employees, and

27

the November letter had the subject, "INA Re Certificate FRC 5441." J. App'x 716–18, 1656–58, No. 19-4335. This suggests that the issuer was INA Re. But the binder references "INA's Reinsurance" and identifies "INA's Net Premium," which arguably suggests that the issuer was INA. Id. at 1656–57.

Century sought to introduce evidence at trial showing that it is not the successor to INA Re. Although that fact was undisputed, Century's evidence of it was nevertheless excluded on the ground that Century had waived the right to deny successorship when it failed to raise that argument as an affirmative defense in its pleadings. On appeal, Century seeks a new trial on its liability under the 1975 certificate.

"We review a district court's evidentiary rulings for abuse of discretion, and will reverse only if an erroneous ruling affected a party's substantial rights." Marcic v. Reinauer Transp. Cos., 397 F.3d 120, 124 (2d Cir. 2005). "Whether an evidentiary error implicates a substantial right depends on the likelihood that the error affected the outcome of the case." Tesser v. Bd. of Educ., 370 F.3d 314, 319 (2d Cir. 2004) (quotation omitted). "Thus, an evidentiary error in a civil case is harmless 'unless [the appellant demonstrates that] it is likely that in some

28

material respect the factfinder's judgment was swayed by the error.'" Id. (alteration in original) (quoting Costantino v. David M. Herzog, M.D., P.C., 203 F.3d 164, 174 (2d Cir. 2000)).

Under Rule 8(c), "affirmative defenses" are waived unless they are raised in a responsive pleading. Fed. R. Civ. P. 8(c); see Travellers Int'l, A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1580 (2d Cir. 1994). An affirmative defense is a defense that "will defeat the plaintiff's . . . claim, even if all allegations in the complaint are true," rather than an attack on the truth of the allegations, or a rebuttal of a necessary element of the claim. Saks v. Franklin Covey Co., 316 F.3d 337, 350 (2d Cir. 2003) (quotation omitted). For example, this Court in National Market Share, Inc. v. Sterling National Bank held that it was no affirmative defense to assert that an intervening cause broke the chain of causation, because the intervening cause challenged "an integral part" of the causation element of the plaintiff's breach-of-contract claim. 392 F.3d 520, 526 (2d Cir. 2004). The defendant had merely asserted "that the plaintiff cannot prove a necessary element of its claim." Id. at 526–27 (quoting Resolution Trust Corp. v. KPMG Peat Marwick, 845 F. Supp. 621, 622, 625 (N.D. Ill. 1994)).

29

The existence of a contract is a necessary element of a claim for breach of contract.  Id. at 525.  To prove this element, Utica introduced evidence that showed that INA or INA Re issued the 1975 certificate.  Century sought to counter Utica with evidence that Century is not INA Re's successor, using the ambiguity in company names on the letters to cast doubt on whether Century was a party to the certificate.  This was a refutation of Utica's case, not an affirmative defense.  The district court abused its discretion by excluding Century's evidence, and this affected Century's substantial rights.

Utica recasts Century's argument as a denial that it is the real party in interest, a defense that is subject to waiver.  This defense arises from the principle that a suit must be brought by "the person who, according to the governing substantive law, is entitled to enforce the right."  Oscar Gruss & Son, Inc. v. Hollander, 337 F.3d 186, 193 (2d Cir. 2003) (quotation omitted).  However, Century is not trying to enforce substantive rights (or defenses) that belong to another.  Rather, Century is attempting to assert only that it is not a counterparty to the certificate--an essential element of Utica's claim.

30

Utica argues in the alternative that Century is liable even if INA Re issued the 1975 certificate. Utica points to a 2013 settlement between Century and a third company, Randall and Quilter Investment Holdings, Ltd. ("R&Q"), that purportedly made Century the reinsurer on the certificate. In 2005, R&Q purchased INA Re from Century's parent company. The 2013 settlement resolved disputes over which liabilities R&Q had assumed. One of the disputes was "whether R&Q or Century is legally responsible under certain assumed reinsurance [contracts] . . . that were written by or on behalf of INA Re as the named reinsurer . . . on the contract." J. App'x 2613, No. 19-4335. The agreement provides that "R&Q is in fact the reinsurer on all INA Re [contracts]" except for (inter alia) "those contracts identified on Exhibit VIII." Id. at 2614. As Utica points out, Exhibit VIII's table attributes contracts "FC13257 and prior" to "INA" under the "Pre-Sale" column and to "INA/Century" under the "Post-Sale" column. Id. at 2632. The 1975 certificate is designated FRC 5541.

The record is insufficient to resolve whether Exhibit VIII can establish that Century is the counterparty to the 1975 certificate. Because Utica is neither a party nor a beneficiary to the settlement between Century and R&Q, it cannot

31

ask us to interpret or enforce their agreement.  See Premium Mortg. Corp. v.

Equifax Info. Servs., LLC, 583 F.3d 103, 108 (2d Cir. 2009) ("[A] non-party to a

contract governed by New York law lacks standing to enforce the agreement in

the absence of terms that 'clearly evidence[] an intent to permit enforcement by

the third party' in question." (quoting Fourth Ocean Putnam Corp. v. Interstate

Wrecking Co., 66 N.Y.2d 38, 45 (1985)).  However, Utica asserts that the

agreement constitutes evidence of Century's succession.  Even so, unresolved

questions of fact lurk.[6]  We decline to reach these factual issues in the first

instance.  The parties may press their arguments on remand.[7]

---

[6] The 1975 certificate is titled *FRC* 5541 in the binder letter, while Exhibit VIII to
the settlement agreement between Century and R&Q references *FC* 13257 and
prior.  Although Utica argues that Century switched to a system that dropped
the "R" from "FRC," and although one of Century's employees so testified in his
deposition, this factual issue was not adjudicated below.  Moreover, Exhibit VIII
refers only to "INA," while the agreement consistently refers to "INA Re,"
including in the provision at issue.  Exhibit VIII may be an exception to R&Q
assuming INA Re contracts, but its reference to INA creates ambiguity.

[7] The only relief Century seeks on appeal is a new trial, but the district court is
free to (re)consider whether the evidence creates a genuine dispute of material
fact for trial.

Finally, Utica argues that Century failed to preserve an objection to its successorship status because it made no offer of proof to the district court. But Century communicated its objection--including the evidence on which it would rely--in a motion in limine and in a motion for summary judgment. That was sufficient. See Fed. R. Evid. 103(a)(2); Fortunato v. Ford Motor Co., 464 F.2d 962, 967 (2d Cir. 1972) (An offer of proof is not "an absolute prerequisite in every appeal"; it is required where "the significance of the excluded evidence is not obvious or where it is not clear what the testimony of the witness would have been or that he was even qualified to give any testimony at all").

**III.**

The last issue on appeal is whether Century is entitled to a new trial on its counterclaim of bad faith with respect to the 1973 certificate. The counterclaim alleges that by "improperly billing Century" for defense costs in addition to limits (among other acts) Utica violated its duty as cedent to act with good faith. J. App'x 1197, 19-4335. As presented in the jury charge, an essential element of this counterclaim was that "Century performed its obligations under the 1973

33

certificate." Id. at 1196. Century contends that the instruction on this element was error. We agree.

The district court instructed that Century "must establish by a preponderance of the evidence [that] it did what it was obligated to do under the 1973 reinsurance certificate," and that "this element is in dispute." Id. at 1196. The verdict sheet likewise instructed the jury to decide whether "plaintiff Utica Mutual Insurance Company prove[d] by a preponderance of the evidence that Century Indemnity Company failed to do what it was obligated to do under the 1973 Certificate." Id. at 596. The jury answered "Yes," defeating Century's counterclaim. These instructions were error because there is no actual dispute whether Century did all it was obligated to do under the 1973 certificate.

As a matter of law, Century is not obligated under the certificate to pay defense in addition to limits--the only pertinent issue at trial regarding Century's obligations. A jury instruction that misinforms the jury on the law requires a new trial unless the error is harmless. Fid. & Guar. Ins. Underwriters, Inc. v. Jasam Realty Corp., 540 F.3d 133, 139 (2d Cir. 2008). Utica argues that any error was harmless because the jury, in a separate question on the verdict sheet, found

34

that Utica had not breached a duty of good faith. But this finding was tainted by the erroneous instruction on Century's obligations. If Century had to pay defense in addition to limits, as the jury found based on instructions, then it was natural for the jury to conclude that Utica's billing was proper and therefore in good faith. A new trial on Century's counterclaim is therefore warranted.

## IV.

For the foregoing reasons, the judgment in No. 19-1241 is affirmed; and the judgment in No. 19-4335 is reversed in part, vacated, and the case is remanded with instruction to enter judgment in favor of Century on the 1973 certificate and for further proceedings on the 1975 certificate.